702 A.2d 444

Arthur Maurice HARDISON

v.

STATE of Maryland.

No. 1816, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Nov. 6, 1997.

226

Jose Felipe Anderson, Assigned Public Defender, Baltimore, for Appellant.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for Appellee.

Submitted before MURPHY, C.J., and KENNEY, and BYRNES, JJ.

BYRNES, Judge.

Appellant Arthur Maurice Hardison was tried and convicted by a jury in the Circuit Court for Baltimore City of two counts each of assault with intent to murder, assault and battery, use of a handgun in the commission of a crime of violence, and carrying a handgun. After merging the lesser included offenses into the assault with intent to murder convictions, the trial court sentenced appellant to five years for both of the assault with intent to murder convictions and a mandatory five years on both of the handgun violations. Appellant presents for review two questions, which we have rephrased:

I. Did the trial court err in ruling inadmissible evidence offered for the purpose of impeachment of a key prosecution witness?

II. Did the trial court err in denying appellant's request for a missing witness instruction?

We find that the trial court erred when it excluded extrinsic impeachment evidence of a prior inconsistent oral statement made by an important prosecution witness. As the court's error was not harmless, we shall reverse appellant's convictions. We do not reach the second issue presented.[1]

### FACTS

### The Shooting Incident

Ronald Copeland and Leonard White were injured in a shooting incident on May 7, 1995. That afternoon, Copeland went to his mother's house in east Baltimore to do his wash. As he was hanging wet laundry on a clothesline, several young boys began to pester him. Copeland took it upon himself to

---

1. Whether a missing witness instruction is proper or necessary is an issue that is fact and time specific. At this point, we cannot anticipate whether the witness who was missing from the first trial will be missing from a second trial and, if so, why. Thus, any comment we would make on that issue would be in the nature of speculation, not guidance.

punish one of them—a nine year old named Dougie, Jr.—by hitting him in the eye. The child ran to his mother's home on Bethel Court. There he found appellant, who was his mother's boyfriend, and enlisted his aid.

Copeland and appellant had known each other for years, having grown up in the same neighborhood. Appellant walked across the playground to Copeland's mother's house and suggested to Copeland that he explain his actions to Dougie Jr.'s mother, Tanya. Copeland, appellant, and Dougie, Jr. then walked to Bethel Court, where they encountered Tanya. At the sight of her son's injury, Tanya burst into tears. A decision was made to call the police. Copeland returned to his mother's house to await their arrival.

The police came and spoke to Copeland, Tanya, and Dougie, Jr., at Copeland's mother's house. The officer told Tanya that she would have to appear before a commissioner to swear out a complaint against Copeland. Tanya had expected the police to take Copeland into custody on the spot and became angry upon being informed that they could not do so. After the police departed, Tanya and Dougie, Jr. returned to Bethel Court, where Tanya contacted Dougie, Sr. and told him what had happened to his son. She then arranged for a friend with a car to give her a ride to the police station.

Presently, Dougie, Sr. and a friend arrived. When they saw the damage to Dougie, Jr.'s eye, they ran to Copeland's mother's house and confronted Copeland, who had been joined by his cousins Leonard White and Eric White. Dougie, Sr. and his friend were armed with a bat and a knife. A scuffle ensued and Copeland and his cousins managed to disarm their visitors. Copeland testified that he did not recall seeing the bat and knife again after that. In any event, Dougie, Sr. and his friend turned and ran up Fayette Street, toward Bethel Court, with Copeland and his cousins in pursuit.

In the meantime, appellant was standing in Bethel Court talking to his friend Darnell. Tanya was in the court too, awaiting her ride. The participants' versions of events diverge dramatically from that point. According to Copeland,

as he ran into the court, Tanya exclaimed, "Oh, you are not dead yet!" The realization that Tanya had dispatched Dougie, Sr. and his friend to kill him prompted Copeland to lash out, punching Tanya in the face several times with his closed fist. Appellant reacted to this attack on his girlfriend by drawing a gun and shooting Copeland in the thigh, hip, and chest. As Copeland turned to escape, he saw appellant and Leonard White grapple for the gun and appellant shoot White.[2]

Appellant testified that, as he was standing in Bethel Court talking to Darnell, Dougie, Sr. came running toward the court with Copeland, bat in hand, running after him. When Copeland reached Tanya, he came to a halt and started to beat her in the face with his fist. Leonard White arrived and took the bat from Copeland. When appellant yelled out at Copeland in anger, Copeland reached into his back pocket, pulled out a knife, and confronted him. Fearing for his life, and aware that his friend Darnell usually carried a gun in his "dip," appellant grabbed Darnell's gun, turned, and shot Copeland. Leonard White then came after appellant with the bat. Appellant blocked the bat with his arm and he and White began to fight for the gun. During the struggle, the gun accidently fired, hitting White. Appellant ran away, disposing of the gun in the parking lot of a chicken restaurant.

Tanya did not witness the shooting. She testified that, after Copeland hit her on the face, she ran into her house. She was inside when the gunfire erupted.

Leonard White was not present for the trial. The only eyewitness to the shooting to testify, other than Copeland and appellant, was Earnest Hollis, who was called by the State. Hollis did not know any of the people involved in the incident. On the afternoon of the shooting, he was working his shift as a supervisor at Church Home Hospital. As he stood outside of

---

**2.** Amazingly, neither man suffered serious injury. Two of the gunshot wounds sustained by Copeland were graze wounds, as was the single wound sustained by Leonard White. Both men were treated and released from the hospital on the day of the shooting.

the hospital smoking a cigarette, he noticed five or six black males running up Fayette Street, toward Bethel Court, yelling and "waiving sticks." One of the men was wearing a white tee-shirt. The group arrived at Bethel Court, where they met up with a man wearing a red sweatshirt. The man in the white shirt approached the man in the red shirt and pulled out a gun. The man in red grabbed the man in white's right arm, which was holding the gun, and a shot went off. Everyone in the court dispersed except the two men, who kept struggling, at times holding their arms and the gun up in the air as they did so. Finally, the man in white re-gained control, stepped back, and shot the man in red, who stumbled backward. The man in white shot the man in red again, and he fell. The man in white then walked away, in the direction of a chicken restaurant.

The uncontradicted testimony of several witnesses established that, at the time of the incident, appellant was wearing a white tee-shirt, Leonard White was wearing a red shirt, and Copeland was wearing a black shirt. In addition, after the shooting, the police retrieved a bat and a knife from the area of Bethel Court where the altercation had occurred. Appellant identified the knife as being the one that Copeland had used against him.

### Examinations of Hollis and Officer Schmidt Regarding Hollis's Out–Of–Court Statement

Approximately fifteen to twenty minutes after the shooting, Earnest Hollis was interviewed by Baltimore City Police Officer Thomas Schmidt. Hollis sat in the patrol car while Officer Schmidt asked him questions and took notes as he responded. Hollis did not write out a statement or give a recorded statement. Officer Schmidt did not show Hollis his notes.

On cross-examination, counsel for appellant questioned Hollis about what he had told Officer Schmidt he had seen:

MR. CARDIN: Did you tell the police that a fist fight started and four males were beating up two males?

MR. HOLLIS: No sir, I don't remember.

MR. CARDIN: I will be specific and say, "A fist fight started and four black males were beating up the two black males."

Did you tell the police that?

MR. HOLLIS: No sir, I don't remember.

MR. CARDIN: Uh-huh. Did you tell the police about a person in a black shirt, a black tee-shirt?

MR. HOLLIS: It is possible, I don't remember in describing one of the gentlemen in the group of people that was running up Fayette Street.

MR. CARDIN: Well, let me ask you this. Did you tell the police that while the gun was being—while there was a struggle going on that another person was shot?

MR. HOLLIS: No, sir.

MR. CARDIN: Specifically, did you tell the police that the male with the red sweatshirt grabbed the shooter's hand and they started wrestling. When two shots were fired, one of these shots struck the male with the black shirt?

MR. HOLLIS: No sir, I didn't mention a gentleman with a black shirt.

MR. CARDIN: Okay. And that the person in the black shirt who was struck at that time then ran from the scene, did you tell the police that?

MR. HOLLIS: No, sir.

Officer Schmidt testified for the State. On cross-examination, he acknowledged that, soon after arriving on the scene, he interviewed Hollis. Later that day, he wrote his police report and incorporated Hollis's statements into it. The State objected when appellant asked Officer Schmidt whether Hollis had told him that he had seen four black males beating up two black males. At the bench, appellant's counsel stated that he had posed the question to elicit evidence of a prior inconsistent statement by Hollis. The trial court sustained the objection, explaining that the basis for the ruling was that the statement was oral hearsay, that it "ha[d] not been identified by Mr.

Hollis as his statement," that it had not been "tie[d] back to the witness," and that the requirements of Maryland Rule 5–613 had not been met. Appellant's counsel proffered the following question of Officer Schmidt:

"Did Mr. Hollis tell you that 'a male with the red sweatshirt grabbed the shooter's hand and they started wrestling when two shots were fired. One of these shots struck the male with the black shirt, who then fled the scene.'?"

The trial court reiterated its ruling during the ensuing colloquy:

THE COURT: Okay. Sustain the objection as to that.

MR. CARDIN: Okay.

THE COURT: On the basis that it is hearsay. That it hasn't been independently shown to the witness, and that the witness is not a party.

MR. CARDIN: I would make it clear, though, that this is absolutely contrary—

THE COURT: And furthermore, counsel objected to the State, when the State was asking what Mr. Hollis said, and I sustained those objections.

MR. CARDIN: Your honor, I understand.

THE COURT: To the police officer.

MR. CARDIN: Only the prior inconsistent statements are admissible for purposes of impeachment.

THE COURT: I understand, but you have to get the witness, who is being impeached, to acknowledge that this was a statement. You've got to be either prior under oath or a signed statement. Here is just an oral assertion—

MR. CARDIN: Mr.—

THE COURT: —By a third party that a witness made a statement, and the witness has denied it.

MR. CARDIN: The witness has denied making the statement to the officer. That Mr. Hollis denied it. It was read to Mr. Hollis, and he denied making it, and it's contrary to what he testified to this jury as to how he was shot.

THE COURT: I'm going to sustain the objection on the basis that it's hearsay.

## DISCUSSION

### A Prior Inconsistent Statement Of A Witness Offered For The Purpose Of Impeachment Is Not Hearsay

■ Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Maryland Rule 5–801(c); Ali v. State*, 314 Md. 295, 304, 550 A.2d 925, 929 (1988). As this definition makes plain, whether an out-of-court statement is hearsay depends upon the purpose for which the statement is offered at trial. A statement that is offered substantively, to prove the truth of its contents, is hearsay, and is not admissible unless an exception to the rule against hearsay applies or admission into evidence is constitutionally required or statutorily allowed. Maryland Rule 5–802; *Stewart v. State*, 342 Md. 230, 236, n. 1, 674 A.2d 944, 947, n. 1 (1996). By contrast, a statement that is offered for a purpose other than to prove its truth is not hearsay at all. *Ali v. State*, at 304, 550 A.2d 925.

■ These general principles guide the analysis of admissibility of a witness's prior inconsistent statement. If a statement made before trial by a witness who testifies to the contrary at trial is offered as substantive evidence, it is inadmissible hearsay; it may be substantively admissible, nevertheless, under the hearsay exception for prior inconsistent statements set forth in Maryland Rule 5–802.1. That rule provides, in pertinent part:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or

other proceeding or in a deposition; (2) reduced to writing and signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement.

Cf., Nance v. State, 331 Md. 549, 629 A.2d 633 (1993) (where special indicia of trustworthiness and reliability exist prior inconsistent statements may be admissible substantively).[3]

■ If a witness's prior inconsistent statement is offered for the purpose of impeachment, it is not being offered as substantive evidence. The objective in using a prior inconsistent statement for impeachment is to attack the declarant's credibility by demonstrating that his testimonial version of events is inconsistent with a version of events that he related prior to trial. When used as a technique to undercut a witness's credibility, the statement is offered to prove its existence, not its truth, and is not hearsay. *Stewart v. State,* at 236, 674 A.2d 944; *Smith v. Branscome,* 251 Md. 582, 590, 248 A.2d 455, 461–462 (1968); *Sun Cab Co., Inc. v. Cusick,* 209 Md. 354, 361–362, 121 A.2d 188, 191 (1956).[4] As the Court of Appeals observed in *Smith v. State:*

Use of a statement for impeachment purposes is not hearsay, since only the fact that the statement was made is being offered, not the truth of the statement.

273 Md. 152, 161, 328 A.2d 274, 279 (1974).

■ In this case, appellant sought to elicit extrinsically, through Officer Schmidt, a statement that witness Earnest

---

3. In 1994, Maryland Rule 5–802.1(a) codified, with some variation, the trustworthiness and reliability criteria for substantive admissibility of prior inconsistent statements that were articulated by the Court of Appeals in *Nance v. State.* The Court of Appeals has observed since then that, even if a prior inconsistent statement meets the requirements of Rule 5–802.1(a), it will not be admitted substantively if circumstances suggest that the declarant did not clearly intend to adopt the statement. *Stewart v. State,* at 238, n. 3, 674 A.2d at 948, n. 3.

4. Rule 5–802.1 is followed by a Committee Note, which states, "This rule does not affect the admissibility of prior inconsistent statements for impeachment purposes..."

Hollis had made to him shortly after the shooting. The essence of the statement was that, as Leonard White (red shirt) and appellant (white shirt) struggled for the gun, a shot was fired accidentally, hitting Copeland (black shirt). Appellant was attempting to use the oral statement to impeach Hollis. Hollis was an available declarant who, during his direct examination, denied making such a statement to the police. Had Officer Schmidt been permitted to answer the question posed, his testimony would have revealed that Hollis's rendition of events to the jury differed from the observations that he had made within minutes of the shooting.[5] Thus, Hollis's out-of-court statement to Officer Schmidt was not being offered to prove the truth of the assertion that Copeland had been shot accidentally by appellant during a struggle for the gun; rather, it was being offered to cast doubt on Hollis's credibility as an eyewitness.

In ruling on the admissibility of Hollis's out-of-court statement, the trial court erred, from the outset, in assessing the statement as hearsay. At no time did appellant seek to offer the statement as substantive evidence; indeed, there was an express proffer of admissibility for the sole purpose of impeachment. Nevertheless, the trial court treated the statement as if it had been offered to prove the truth of the matter asserted and, on that basis, analyzed its admissibility by applying the rule against hearsay and the prior inconsistent statement exception to it. Having taken that wrong turn, the court found itself on a path lined with issues that were not relevant to the evidentiary question before it: for example, whether the statement had been reduced to writing and signed by Hollis and whether the statement had been given

---

5. While the proffer made by appellant's counsel did not specify the response that Officer Schmidt would have given to the question, the question itself was framed using words quoted from Officer Schmidt's report. Thus, the context of the question to Officer Schmidt made plain that he would have answered it by stating that Hollis had told him that "a male with the red sweatshirt grabbed the shooter's hand and they started wrestling when two shots were fired. One of these shots struck the male with the black shirt, who then fled the scene." This was a satisfactory offer of proof under Md. Rule 5–103(a)(2).

under oath. These issues, pertinent to the Rule 5–802.1(a) hearsay exception, had no bearing on the admissibility of Hollis's statement for the purpose of impeachment.[6]

### Admissibility Of Extrinsic Evidence Of A Prior Inconsistent Statement For The Purpose Of Impeachment

Maryland Rule 5–616 permits extrinsic evidence of prior inconsistent statements to be used for the purpose of impeachment, in accordance with Maryland Rule 5–613(b). Under Rule 5–613(b), for extrinsic evidence of a witness's prior inconsistent *oral* statement to be admissible for impeachment, the following foundation must be laid: 1) the contents of the statement and the circumstances under which it was made, including the person to whom it was made, must have been disclosed to the witness during his trial testimony; 2) the witness must have been given the opportunity to explain or deny the statement; 3) the witness must have failed to admit having made the statement; and 4) the statement must concern a non-collateral matter. Before the requirements of Rule 5–613(b) come into play, however, the prior statement of the witness must be established as inconsistent with his trial

----

6. During Officer Schmidt's testimony, the trial judge stated that he wanted to rule consistently on the objections to questions posed by the State and the objections to questions posed by the defense. The different purposes for the questions required that the rulings on objections to them not be the same, however, even though the questions were the same. The State's sole purpose in asking Officer Schmidt what Earnest Hollis had told him during the patrol car interview was to elicit Hollis's words for use as substantive proof. While the Maryland Rules permit impeachment of one's own witness, *see* Rule 5–607, the State presented Hollis throughout the trial as an impeccably truthful and accurate independent witness. The questions that it posed were not designed to attack Hollis's credibility. As such, the out-of-court statement of Hollis sought by the State through Officer Schmidt was hearsay that did not satisfy the criteria for substantive admissibility under Maryland Rule 5–802.1(a). The trial court properly ruled it inadmissible. When the defense asked Officer Schmidt about Hollis's statement, the objective was impeachment, however, and an altogether different analysis was required.

testimony. *See Stevenson v. State,* 94 Md.App. 715, 721, 619 A.2d 155, 158 (1993).

■ The statement that Hollis made to the police differed from his subsequent trial testimony by virtue of omission. In the version of events that Hollis recounted to Officer Schmidt, a shot was fired accidentally, hitting Copeland, as appellant and Leonard White were struggling for control of the gun. In the version of events that Hollis recited to the jury, no one was shot accidentally and Copeland was not among the cast of characters. In *Jencks v. United States,* the Supreme Court held that "inconsistency" exists between the trial testimony of a witness and the witness's prior statement when the trial testimony includes facts that were omitted from the first statement. The Court reasoned:

> Flat contradiction between the witness's testimony and the version of events given in his reports is not the only test of inconsistency. The omission from the report of facts related at trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony.

353 U.S. 657, 667, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103 (1957). Likewise, omission from trial testimony of facts recited earlier is an inconsistency. As explained in Joseph F. Murphy, Jr., Maryland Evidence Handbook, Section 1302(F), at 676 (2d ed. 1993):

> The test is one of logic: "Does the omission make the statement inconsistent?" If the answer is "yes," the omission may be fully explored; if the answer is "no," you cannot treat the omission as an inconsistency.

The absence from Hollis's trial testimony of his observation that a man in a black shirt was at the scene and that a person on the scene was shot accidentally during the melee made the eyewitness account supplied by Hollis at trial significantly different than the eyewitness account that he reported to Officer Schmidt on the day of the shooting. Without those central facts, Hollis's trial testimony was just as "inconsistent"

with his original statement as it would have been had he contradicted specific facts. The two versions of events were logically inconsistent.

At the conclusion of the State's direct examination of Hollis, appellant sought to capitalize on the inconsistencies in Hollis's renditions of events by impeaching him on cross-examination. In so doing, appellant satisfied three of the four criteria that must be met to lay a proper foundation for use of extrinsic impeachment evidence under Rule 5–613(b). First, the questions posed by appellant to Hollis disclosed to him the precise language of the prior oral statement the defense was contending he had made and that the statement had been made to Officer Schmidt during the interview that took place soon after the shooting. Second, Hollis was given the opportunity to explain or deny the prior statement. Third, Hollis failed to admit that he had made the statement.

The last Rule 5–613(b) criterion for admissibility of extrinsic evidence of a prior inconsistent statement for impeachment—that the statement concern a non-collateral matter—codifies a long-standing requirement under Maryland case law. The test for materiality is "whether the fact, as to which error is predicated, could have been shown in evidence for any purpose independently of the self-contradiction." *Smith v. State,* 273 Md. 152, 160, 328 A.2d 274, 280 (1974); *Kantor v. Ash,* 215 Md. 285, 290, 137 A.2d 661, 664 (1958); *Stevenson v. State,* supra, at 722, 619 A.2d 155. In other words, a fact that is material to the issues in a case so as to be admissible irrespective of its use to counter contrary evidence is a non-collateral fact.

The facts stated orally by Hollis to Officer Schmidt were not tangential or marginal. They directly concerned the main event in the case. In deciding appellant's fate, the jury's primary task was to determine how the shooting had occurred: did appellant shoot one victim in self-defense and the other by accident or did appellant gun down both victims as revenge for the attacks on Tanya and her son? It is difficult to imagine testimony that could be less collateral and more material to

the question how the shooting occurred than Hollis's eyewitness account to Officer Schmidt of that event.

Even though appellant satisfied the criteria spelled out in Rule 5–613(b) for extrinsic use of a prior oral inconsistent statement for impeachment, the trial court concluded that his proffered cross-examination of Officer Schmidt about Hollis's statement was not permitted, under Rule 5–613, because the statement had not been shown to Hollis, Hollis had not acknowledged or identified the statement as his own, and the statement had not been "tied back" to Hollis. We explain why, in addition to the error resulting from the treatment of Hollis's statement as hearsay, the trial court erred in its interpretation of Rule 5–613.

When a witness's prior inconsistent *written* statement is being used to impeach him, whether intrinsically or extrinsically, Rule 5–613 requires that, at some point during his examination, the witness be shown the statement. In this case, Hollis's statement was oral, not written. The fact that Officer Schmidt took notes about the statement and incorporated them into his police report did not make Hollis's statement a written statement. Appellant was not required to show Hollis Officer Schmidt's written report, as that did not constitute the prior inconsistent statement at issue. Rather, because Hollis's statement was oral, appellant was required to inform Hollis of its contents and the circumstances under which it was made, which he did.

A witness who is being impeached with a prior inconsistent statement through the testimony of another need not acknowledge or identify the statement as his own. Indeed, such a requirement would defeat the purpose of Rule 5–613. Extrinsic evidence of a prior inconsistent statement is not needed to impeach a witness unless the witness has denied or claims not to recall making the prior statement. For that reason, Rule 5–613(b) requires the opposite of acknowledgment: before extrinsic evidence may be used to impeach a witness about his prior inconsistent statement, he must refuse to admit that the statement was made by him.

 The line of Maryland cases holding that a witness must acknowledge or approve a written statement before it may be used to impeach him does not limit, or even apply to, impeachment by use of an oral statement. When a person other than the witness reduces the witness's spoken words to writing, and the witness ratifies the writing by signing, adopting, or approving it, the writing will be treated as if it had been prepared by the witness himself. *Collins v. State*, 318 Md. 269, 568 A.2d 1, 10, n. 10, *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990). *See also Henry v. State*, 324 Md. 204, 596 A.2d 1024, *cert. denied*, 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992); *Bruce v. State*, 318 Md. 706, 569 A.2d 1254, *appeal after remand*, 328 Md. 594, 616 A.2d 392, *cert. denied*, 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993). *Jones v. State*, 310 Md. 569, 530 A.2d 743, *cert. granted, vacated* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916, *on remand*, 314 Md. 111, 549 A.2d 17 (1988). Thus, if Hollis had ratified Officer Schmidt's report, it could have been treated as if it had been written by Hollis and used to impeach him, under Rule 5–613. That principle has no bearing, however, on the use of Hollis's oral statement for impeachment. The fact that Hollis did not read, approve, or adopt Officer Schmidt's written report did not insulate him from being impeached with his own oral statement. Indeed, if that were the case, a witness whose remarks to the police were not included in a police report could be impeached by his own words while a witness whose remarks to the police were included in a police report could immunize himself from impeachment by refusing to adopt or approve the report.

Finally, Rule 5–613 does not require that an oral statement that is being used to impeach a witness extrinsically be "tied back" to the witness before examination of the person to whom the statement was made. By the time that extrinsic evidence is being used for impeachment, the witness who made the prior inconsistent statement will have denied making it. The very purpose of examining the person to whom the statement supposedly was made is to connect the statement to its maker. In this case, that would have been accomplished by

allowing appellant to proceed with his cross-examination of Officer Schmidt.

The trial court erred in ruling inadmissible extrinsic impeachment evidence of a prior inconsistent statement by Earnest Hollis. The question remains whether that error was harmless.

### Harmless Error

■■■ In a criminal case, the test for determining whether error by the trial court was harmless is whether, upon an independent review of the record, we are able to "declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976). We must assess whether the properly admitted evidence in this case so far outweighs the prejudice caused by the exclusion of the Hollis impeachment evidence that there was no reasonable possibility that the verdict would have been different had the impeachment evidence come in. *Ross v. State*, 276 Md. 664, 674, 350 A.2d 680, 687 (1976).

■■■ For reasons akin to our finding that Hollis's oral statement to Officer Schmidt concerned a non-collateral matter, our independent review of the record does not persuade us, beyond a reasonable doubt, that the exclusion of that statement from evidence did not contribute to the guilty verdicts against appellant. Hollis was the only independent eyewitness to the shooting. The competing versions of events presented by the prosecution and the defense were diametrically opposed and the testifying victim and appellant each had a strong interest in having his own version of events prevail. Under the circumstances, the jury was certain to place great weight on the direct evidence that Hollis's testimony supplied. Moreover, there was a dearth of physical or circumstantial evidence on which to base a finding of guilt independent of the testimony of Copeland, appellant, and Hollis. Without a meaningful amount of evidence to consider beyond the testimony of those three men, two of whom were biased, it was

inevitable that Hollis's testimony—and his credibility as a witness—would be key to the jury's deliberations.

Impeachment by use of a prior inconsistent statement is a valuable and frequently used method for challenging the credibility of a witness, not only in terms of whether the witness is biased or prone to fabrication but also with respect to the accuracy of his observations and his strength or weakness of memory. In this case, the jury had nothing before it to indicate that Hollis's ability to observe events had been impaired or that his recollection of the incident had been anything other than consistent and, by inference, accurate. Had Hollis's prior inconsistent statement come into evidence through Officer Schmidt, however, the jury's perception of Hollis as a witness and the consequent weight that it assigned his testimony might have changed significantly, to appellant's advantage. Members of the jury might have thought that Hollis had forgotten the details of the day; that he had not observed the events with a level of attention necessary to provide a reliable report; that he had become confused about the events in the interim; or that he had become vested in cooperating as a State's witness to the point of editing from his testimony events that he had seen but that he did not think were helpful to the prosecution. Any such thought might have diminished the value of the key prosecution witness's testimony in the eyes of the jury and brought about a different verdict.

The trial court's error in this case was not harmless beyond a reasonable doubt.

**JUDGMENTS REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY; COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**