*Wardell Monroe Brooks v. State of Maryland*
No. 46, September Term 2013

**Evidence - Impeachment of Witness - Prior Inconsistent Statement.** To impeach a witness with extrinsic evidence of a prior allegedly inconsistent oral statement, a party must satisfy the conditions set forth in Maryland Rule 5-613. If the only extrinsic evidence offered is a written summary of the prior oral statement, it must be a substantially verbatim version of the oral statement unless the witness who made the oral statement has previously adopted or ratified the writing as an accurate summary of the prior oral statement.

**Evidence - Opinion Testimony - Expert Forensic Nurse - Veracity of Another Witness - Harmless Error.** In a case involving an alleged rape, a prosecutor may ask an expert forensic nurse who examined the complaining witness whether the events that the complaining witness reported to the nurse were "consistent or inconsistent with" the physical injuries observed by the nurse during that examination. The nurse's response that the observed injuries "would verify" the story of the complaining witness, although in some respects synonymous to an appropriate response to the question, might be construed as an impermissible evaluation of the veracity of another witness. In a case in which the prosecutor posed the question in the correct manner, in which the nurse's testimony otherwise concerned the details of the complaining witness's physical injuries rather than her credibility, in which the prosecution did not suggest in closing argument that the nurse had vouched for the complaining witness's credibility, and in which there was overwhelming evidence of a violent sexual assault, the trial court's decision not to strike the nurse's answer was, at worst, harmless error.

**Sentencing - Merger of Convictions - Rape and False Imprisonment.** Two convictions merge for sentencing purposes if (1) they are based on the same act or acts and (2) one offense is a lesser-included offense of the other under the required evidence test. Under *Nicolas v. State*, 426 Md. 385, 44 A.3d 306 (2012), a court is to resolve factual ambiguities in favor of the defendant. When the record was ambiguous as to whether the jury's guilty verdict on a false imprisonment court was based on the same act or acts as its guilty verdict on a first degree rape count, the defendant's conviction for false imprisonment should have been merged into the conviction for first degree rape.

IN THE COURT OF APPEALS

OF MARYLAND

No. 46

September Term, 2013

_____

WARDELL MONROE BROOKS

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by McDonald, J.
Adkins, J., concurs.
Harrell and Greene, JJ., dissent.

_____

Filed: August 27, 2014

A jury in Harford County convicted Petitioner Wardell Monroe Brooks of one count each of first degree rape, second degree rape, second degree assault, and false imprisonment. Mr. Brooks was sentenced to life imprisonment, all but 50 years suspended, for the first degree rape conviction, and a consecutive 40-year prison sentence, all but 20 years suspended, for the false imprisonment conviction. The court merged the convictions for second degree assault and second degree rape into the conviction of first degree rape. The convictions were affirmed by the Court of Special Appeals.

Before us, Mr. Brooks asserts that his convictions should be reversed because the trial court made erroneous evidentiary rulings when it: (1) declined to admit into evidence a police report that contained a prior allegedly inconsistent oral statement of the complaining witness and (2) failed to strike testimony of an expert forensic nurse who had examined the complaining witness and who testified that the complaining witness's physical injuries "would verify" what she had told the nurse about her encounter with Mr. Brooks. In the event that we do not reverse his convictions, Mr. Brooks argues that his conviction for false imprisonment must be merged into his conviction for first degree rape for sentencing purposes and that, accordingly, the consecutive sentence imposed for false imprisonment should be vacated.

We hold that the Circuit Court properly excluded the police report. We further hold that, even if the nurse's statement that the injuries she observed "would verify" the account of the complaining witness could be construed as an impermissible comment on the veracity of another witness, it was harmless error under the circumstances of this case. Finally, we

hold that, under the facts of this case, Mr. Brooks' conviction for false imprisonment should be merged into his conviction for first degree rape.

## Background

### *The Trial*

We briefly summarize the evidence at trial. The circumstances surrounding the rulings on the two evidentiary issues that are the subject of this appeal are described in greater detail in conjunction with the analysis of those issues later in this opinion.

#### *Prosecution Case*

In the fall of 2008, Laura B.,[1] a 62-year-old resident of Alabama, was staying at the Harford County home of her deceased mother in order to prepare the home for auction. While doing yard work one day, she met Mr. Brooks, a 53-year-old man who worked as a "handyman," when he walked by her mother's home. Laura B. offered to hire him to weed and clean up a ditch in the yard. Mr. Brooks agreed and returned the next day to do the work.

Laura B. hired Mr. Brooks several other times to perform odd jobs and, on several occasions, drove Mr. Brooks home, approximately three miles from her mother's house. According to Laura B., Mr. Brooks would stop by to look for work from time to time, and, when Laura B. told him that she did not have money to hire him, Mr. Brooks would "chit chat" and "just kind of hung around."

---

[1]Consistent with the convention adopted by the Court of Special Appeals and the parties in their briefs, we refer to the complaining witness in this case by her first name and the first initial of her last name.

Laura B. testified that, in the early evening hours of October 9, 2008, she was taking a nap in a bedroom in her mother's house when she was awakened by a noise. She went back to sleep, thinking that her sister had come in the house. When she next opened her eyes, Mr. Brooks was standing beside her bed with his pants on the floor and demanding sex. She asked Mr. Brooks why he was in her bedroom and told him he was not supposed to be in the house. When she said, "You need to get out of here," and tried to push him toward the bedroom door, Mr. Brooks grabbed her hair and began to drag her. She picked up a ceramic statue, which was being used as a doorstop, and struck Mr. Brooks on the head with it, shattering the statue. Mr. Brooks began to beat and choke her. Pleading with him to stop, Laura B. told Mr. Brooks that she would submit to his demands but that she needed a moment. He stopped attacking her.

With Mr. Brooks behind her, Laura B. went to the living room, drank some water, and smoked a cigarette. After a while, Mr. Brooks said "it was time," and she went in the bedroom, where Mr. Brooks forced her to have sexual intercourse. She testified that, during intercourse, Mr. Brooks was bleeding from his head wound. Experiencing physical pain and wondering when Mr. Brooks would stop, Laura B. asked for a "break." Mr. Brooks allowed her to get up and go to the living room. According to Laura B., he then followed her around the house like a "shadow." She asked Mr. Brooks to leave her alone. He responded that "This is nothing" and told her not to call the police or anyone else.

3

Laura B. eventually ran back into the bedroom ahead of Mr. Brooks, dialed 911 on the telephone, and immediately hung up. When the 911 operator called back, Mr. Brooks told her not to answer it. Laura B. told him that the caller was probably her sister, who would come to the house if she did not answer the telephone. Laura B. answered the call and pretended to be speaking with her sister. The 911 operator, eventually realizing that Laura B. might be in danger, informed her that the police would be dispatched.[2] Laura B. laid the telephone down, told Mr. Brooks that she needed a drink, and went to the kitchen. When she realized that Mr. Brooks had remained in the bedroom, she ran down to the basement and out of the house, grabbing some clothes from a clothesline. She hid outside the house until the police arrived.

Mr. Brooks was arrested as he left the house through the back door. Laura B. was subsequently taken by ambulance to Harford Memorial Hospital, where she was examined by a nurse.

Deputy Sheriff Jesse Faby, the first officer to arrive at Laura's B's home, testified that he was dispatched to the home while patrolling nearby. When he arrived, he found Laura B. standing in her driveway. He remained at the scene until the investigation was completed. During cross-examination, Deputy Faby stated that he spoke to Laura B. at the scene before she went to the hospital and that he "jotted down basic information" after their conversation

---

[2]A recording of the 911 call was played for the jury at trial.

4

and later generated a report using those notes. Defense counsel moved to admit Deputy Faby's report into evidence, but the trial court denied the motion.

Other law enforcement officers described how the sheriff's office processed the scene for evidence. Forensic scientists from the Maryland State Police Laboratory testified about the collection of evidence at the house, the DNA profile developed on that evidence, and its match to Mr. Brooks. Eighteen items, including a bed sheet, a quilt from the bed, and the broken statue that Laura B. had used to strike Mr. Brooks, were retrieved from the house and taken to the Crime Scene Unit where they were eventually packaged and sent to a lab for testing. DNA swab samples were collected throughout the house and from Mr. Brooks. DNA analysis established that Mr. Brook's DNA profile matched the DNA profile obtained from Laura B.'s shirt and the quilt. DNA from more than one individual was obtained from penile swabs of Mr. Brooks, although Mr. Brooks was "the major contributor" to the DNA obtained from those swabs.

The prosecution called nurse Phyllis Harden, a certified Sexual Assault Forensic Examiner ("SAFE"), who examined Laura B. a few hours after Laura B. arrived at the hospital. Nurse Harden had been a registered nurse since 1979 and a SAFE nurse since 2000. As of the time of trial, she had conducted more than 200 sexual assault forensic examinations. The Circuit Court qualified her as an expert in "forensic nursing examinations with an emphasis in sexual assaults."

Nurse Harden testified that she had interviewed Laura B. as part of the examination. Her notes of that interview, in which Laura B. provided an account of that evening essentially the same as her testimony in court, were admitted into evidence over a defense objection. Nurse Harden then testified in detail about the injuries she observed on Laura's face, arms, knees, and thighs, and "a very profound" injury to her genitalia "caused by blunt force trauma." Her written report and photographs of Laura B.'s injuries were admitted into evidence. At the end of her direct examination, the prosecutor asked Nurse Harden for her opinion as to whether Laura B.'s statement to her was "consistent or inconsistent with" the injuries she had observed in her physical examination of Laura B. Nurse Harden responded that her examination "would verify" what Laura B. had told her. The defense objected and moved to strike Nurse Harden's statement, but the Circuit Court overruled the objection and declined to strike the testimony.

*Defense Case*

The only defense witness was Mr. Brooks, who testified that he and Laura B. had engaged in consensual sex. He testified that, on the night in question, he had walked from a bar to Laura B.'s house to ask for a ride home. He knocked on her back door, and when Laura B. came to the door, he asked her for a ride, at which point she invited him into the house.

According to Mr. Brooks, once in the kitchen, he asked Laura B. if she had work for him to do, and he agreed to clean her windows. Mr. Brooks testified that, because Laura B.

6

did not have any money, she agreed to have sex with him in exchange for the window cleaning. According to Mr. Brooks, they then had consensual sex in the bedroom. When Mr. Brooks informed Laura B. that he could not come back the next day to clean the windows, but would come two days later, she became upset and hit him with a statue, leaving him "dazed."

Mr. Brooks denied hitting, striking, or assaulting Laura B. in any manner, but admitted that he threw "something" at her "because she hit [him]." However, he said that he did not remember much about what happened that night. He testified that he tried to leave Laura B.'s house through the back door when he saw police lights because that was the door through which he had entered the house. He denied telling Laura B. not to answer the phone or following Laura B. around the house.

*Verdict and Sentence*

On January 29, 2010, after five days of trial, the jury returned a verdict finding Mr. Brooks guilty of first degree rape by threat, second degree rape, second degree assault, and false imprisonment. The jury acquitted Mr. Brooks of rape in the first degree with a dangerous weapon, rape in the first degree in connection with a burglary, first degree assault, and first degree burglary.[3]

---

[3]The trial court had granted a motion for judgment of acquittal with respect to a charge of wearing and carrying a dangerous weapon.

On April 13, 2010, the Circuit Court sentenced Mr. Brooks to life imprisonment, all but 50 years suspended, for the first degree rape conviction, and a consecutive 40-year prison sentence, all but 20 years suspended, for false imprisonment. The court merged the second degree assault conviction and second degree rape conviction into the first degree rape conviction for sentencing purposes, but declined to merge the false imprisonment conviction into the first degree rape conviction.

*Appeal*

Mr. Brooks appealed to the Court of Special Appeals, which affirmed the judgments of the Circuit Court in an unreported opinion. One member of the panel would have reversed the convictions on the ground that it was error not to strike Nurse Harden's statement that Laura B.'s injuries "would verify" her version of events and that such an error was not harmless.

Mr. Brooks filed a petition for certiorari, which we granted to consider two evidentiary issues and, if the convictions are affirmed, one sentencing issue. In particular, we are asked to consider the following three questions:

(1)     Whether the Circuit Court should have admitted into evidence, under Maryland Rules 5-613 and 5-616, extrinsic evidence of a prior allegedly inconsistent oral statement of Laura B. in the form of a police report and, if so, whether the failure to do so was harmless error.

8

(2)     Whether the Circuit Court should have struck the statement of Nurse Harden that her forensic examination of Laura B. would "would verify" what Laura B. had told her about her encounter with Mr. Brooks and, if so, whether the failure to do so was harmless error.

(3)     Whether the Circuit Court should have merged the conviction for false imprisonment into the first degree rape conviction for sentencing purposes.

## Evidentiary Issues

### A.     Standard of Review

The standard of appellate review of an evidentiary ruling turns on whether the trial judge's ruling was based on a pure question of law, on a finding of fact, or on an evaluation of the admissibility of relevant evidence.  Questions of law are reviewed without according the trial judge any special deference; findings of fact are assessed under a "clearly erroneous" standard; and an assessment of the admissibility of relevant evidence is reviewed under an abuse of discretion standard.  *See, e.g.*, *J.L. Matthews, Inc. v. Maryland-National Capital Park and Planning Comm'n*, 368 Md. 71, 92, 792 A.2d 288 (2002); *Ruffin Hotel Corp. of Maryland, Inc. v. Gasper*, 418 Md. 594, 620, 17 A.3d 676 (2011).  For example, a ruling on whether relevant evidence should be admitted or excluded under Maryland Rule 5-403[4]

---

[4]Rule 5-403 allows a court to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

would be subject to review under an abuse of discretion standard while a determination of whether a statement is hearsay is a legal question subject to *de novo* review. *Compare State v. Simms,* 420 Md. 705, 724-25, 25 A.3d 144 (2011) *with Parker v. State*, 408 Md. 428, 437, 970 A.2d 320 (2009). Both of the evidentiary issues before us ultimately depend on a question of law and accordingly we review the trial court's rulings without according them special deference.

## B.     *Whether the Police Report was Admissible*

*Foundation Laid by Defense Counsel, Offer of Report, and Court Ruling*

At trial, Laura B. testified on direct examination, that she was taking a nap on the night of the alleged rape, and that she first knew that Mr. Brooks was in her house when she heard a noise, awoke, realized an intruder was in her bedroom, and recognized Mr. Brooks. On cross-examination, defense counsel sought to impeach Laura B. through a police report by Deputy Faby. Among other things, that report summarized his brief conversation with Laura B. that night after the police arrived at her home. The portion of that report that was allegedly inconsistent with her trial testimony stated:

> ... Upon arrival on the scene, Dfc. Faby made contact with the complainant [Laura B.]. When asked what had happened, [Laura B.] advised the following. She advised that she had Wardell Brooks over to her house at 1930 hrs. She advised that during this time, Mr. Brooks said "I want some pussy." She advised that she told him no but he kept following her around the house. She advised that she went into her bedroom to take a nap. She was awoken by the sound of him stumbling through the bedroom door. She saw that he was not wearing a shirt and had his pants down around his ankles.…

10

While the report was consistent with Laura B.'s testimony that she was raped by Mr. Brooks,[5] the defense argued that it could be interpreted to mean that Laura B. had invited Mr. Brooks to her house that evening, which would be inconsistent with her testimony that he was an unexpected intruder.

Defense counsel cross-examined Laura B. concerning her conversation with Deputy Faby that night as follows:

> [DEFENSE COUNSEL]: Do you remembering speaking to a Deputy Faby, a uniformed deputy sheriff, that evening when [the police] came to your house?
>
> [LAURA B.]: I spoke to someone. I have no idea who it was.
>
> [DEFENSE COUNSEL]: You just don't remember his name, right?
>
> [LAURA B.]: Right.
>
> . . .
>
> [DEFENSE COUNSEL]: Do you remember telling this deputy . . . that you had Wardell Brooks over your house about 7:30 that evening?
>
> [ASSISTANT STATE'S ATTORNEY]: Objection, your Honor.
>
> [LAURA B.]: I did not.

---

[5]The second paragraph of the report recounted Laura B.'s struggle with Mr. Brooks, his assault of her, her submission to his advances, and her escape in terms similar to her testimony at trial. The third and final paragraph of the report concerned the apprehension of Mr. Brooks, the transport of Laura B. to the hospital, and other details of the investigation that night.

11

[ASSISTANT STATE'S ATTORNEY]: Objection.

THE COURT: Overruled.

…

[DEFENSE COUNSEL]: ... [D]id an officer ask you a question, and did you respond that Wardell Brooks had come over to your house at 7:30 that evening?

[LAURA B.]: I said that Wardell Brooks – they asked what time he came in, and I said that I noticed him, I woke up at approximately dusk. I didn't know the time. It was 6:30 or 7:30.

[DEFENSE COUNSEL]: Ma'am, please listen to the question.

[LAURA B.]: I am trying to.

[DEFENSE COUNSEL]: Just listen to my question. Did you or did you not tell Officer Faby or some other uniformed officer that evening at your house when they arrived that you had Wardell Brooks over your house about 7:30 that evening?

[LAURA B.]: No.

[DEFENSE COUNSEL]: Did you or did you not?

[LAURA B.]: No.

Counsel argued to the court their respective positions concerning the admissibility of the prior allegedly inconsistent statement of Laura B. to Deputy Faby. Defense counsel relied on Maryland Rules 5-613, while the Assistant State's Attorney argued that the requirements of Maryland Rules 5-802 and 5-802.1, concerning exceptions to the hearsay rule, also had

12

to be satisfied. Defense counsel did not offer the report in evidence during Laura B.'s testimony.

The State called Deputy Faby as its next witness. During cross-examination, Deputy Faby confirmed that he had written a police report concerning the incident. Defense counsel produced a copy of Deputy Faby's report, which was marked for identification as Defendant's Exhibit 1. Defense counsel then questioned Deputy Faby concerning the report as follows:

> [DEFENSE COUNSEL]: And as a result of your conversation with [Laura B.], you indicated that you generated some notes, and is it fair to say that you subsequently reduced that to the document marked as Defense Exhibit 1?
>
> [DEPUTY FABY]: That's correct.
>
> [DEFENSE COUNSEL]: And that is your signature at the bottom, correct?
>
> [DEPUTY FABY]: Yes.
>
> …
>
> [DEFENSE COUNSEL]: And is that a fair and accurate representation of the information that you took from your notes and put in that report?
>
> [DEPUTY FABY]: Yes.

Defense counsel then moved that the report be admitted into evidence. The State objected. A bench conference was held to discuss the admissibility of the report. Although the

13

prosecutor recognized that defense counsel was trying to impeach Laura B., his argument centered around Rule 5-802.1 and defense counsel also focused on that rule:

> [ASSISTANT STATE'S ATTORNEY]: There is no rule that provides for a police report per se to be admitted into evidence. . . . And, again, I have to refer back to the rules. 5-802.1 doesn't allow for that because the three sub areas that would allow that would be, number one, a written statement signed by her, and it was not; number two is that electronically recorded, essentially verbatim statement of hers, and it's not; and the third one is it's some other statement by her that maybe she didn't sign that wasn't recorded in some other fashion, but that she somehow otherwise adopts it. . . [T]his doesn't come in under any of those.
>
> [DEFENSE COUNSEL]: Under 5-802, as long as an adversary party is introducing the statement of the officer into evidence, then it is an exception to the hearsay rule.

The Circuit Court ultimately agreed with the State's approach to the issue:

> I still think [the State's] interpretation of the rule is the correct one. It hasn't been adopted by the witness, the previous witness in this case, as a prior statement. This is just the officer's recordation of what he believes he was told by the witness. So it doesn't come in.
>
> …
>
> But it doesn't come in under this provision. It doesn't come in also because you have the officer in here testifying. It doesn't come in.

After that ruling, defense counsel did not ask Deputy Faby about his notes or about the statement allegedly made to him by Laura B. that "she had [Mr. Brooks] over to her house." The State called two other police officers to testify, and the court adjourned the proceeding for the day.

14

The next morning, defense counsel asked the trial court to reconsider its ruling on the admissibility of Deputy Faby's report. This time, defense counsel invoked Rules 5-613 and 5-616, and argued that the requirements of Rule 5-802.1 were not applicable because the report was not being offered for the truth of the matter asserted, but was being offered for the purpose of impeachment:

> [DEFENSE COUNSEL] Yesterday Your Honor ruled on my request to admit Defendant's Exhibit Number 1, which was a statement taken from [Laura B.] by Dfc Faby. We reapproached the bench, and I made an argument that it should come in as a prior inconsistent statement under Rules 5-613, 5-616, and 5-801, and the appropriate sections, subsections, that we argued at the bench yesterday.
>
> I believe implicit in that, and without saying anything, that the Court should have considered that statement should come in as non hearsay, not offered for the truth, because it was being offered for purposes of the lack of credibility of the witness, who was [Laura B.].

Again, the prosecutor focused on Maryland Rule 5-802.1 concerning exceptions to the hearsay rule:

> [ASSISTANT STATE'S ATTORNEY]: Well, Your Honor, I think we still go back to the requirements of Rule 5-802.1 under subsection (a) that unless it's a purported statement of a witness which is otherwise signed, recorded verbatim, usually through electronic means or otherwise adopted by a witness, that it's not subject to being admitted because it doesn't meet the requirements of that rule, and that has not changed.

Defense counsel once again argued that the requirements of the hearsay rules were not applicable:

15

[DEFENSE COUNSEL]: Your Honor, 5-802.1(a) has nothing to do with its admissibility, the admissibility of the statement as a statement being admitted as non hearsay for purposes of showing an inconsistent statement that would relate to the credibility of the witness.

We have a witness who testified she gave no permission to have Mr. Brooks come into her house that day, and she makes a statement, at least it's in Deputy Faby's report, that she had Mr. Brooks over that day, which is totally and completely inconsistent. It's not necessary to even address 5-802.1 for that purpose, and, therefore, I think [the Assistant State's Attorney]'s argument is not appropriate on that issue.

Ultimately, the Circuit Court ruled that the report was not admissible because Laura B. neither signed nor adopted the report. The Circuit Court also appeared to conclude that Rule 5-802.1 was applicable because the report was being offered for the truth of the matter asserted in it:

My prior ruling will stand. In addition to those reasons that I indicated earlier, but also because in this case, you still have to get over the hurdle of the witness having adopted it or signed it, and you are not over that hurdle in this case. And it really does go, and it is being offered, really, to go to the heart of what's being asserted, the truth of the matter asserted here: how did Mr. Brooks get into the victim's home? So the previous ruling stands and the report is not admissible.

*Analysis*

*Identifying the Applicable Rules of Evidence*

Maryland Rule 5-802 provides generally that "*[e]xcept as otherwise provided by these rules* or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." (emphasis added.) For our purposes, the key phrase is the introductory clause

16

that allows the introduction of hearsay pursuant to other rules of evidence. The prosecutor, and to some extent the trial court, focused on Rule 5-802.1, which permits some hearsay statements to be admitted for substantive purposes. Both were correct in their assessment that Deputy Faby's police report was not admissible under that rule.[6]

But Rule 5-802.1 is not the only rule that allows for introduction of a prior inconsistent statement into evidence. As Mr. Brooks' counsel argued, Rules 5-616 and 5-613 independently allow for the introduction of evidence of prior inconsistent statements for the purpose of impeachment. Before us, both the State and Mr. Brooks agree that the decision whether to admit Deputy Faby's report turned on the proper application of those rules.

---

[6]In its opinion in this case, the Court of Special Appeals concisely and correctly analyzed the issue of admissibility under that rule:

> ... Maryland Rule 5-802.1 provides for the admission of: "A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath ...; (2) reduced to writing and was signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement." Rule 5-802.1(a).

> Here, Deputy Faby's report ... was not a statement given by Laura B. under oath, was not adopted or signed by Laura B., and was not recorded contemporaneously with the making of the statement. The report, therefore, was not admissible as substantive evidence under rule 5-802.1.

17

*Application of Rules 5-613 and 5-616*

Rule 5-616 permits extrinsic evidence of a prior inconsistent statement to be used for the purpose of impeachment, in accordance with Rule 5-613(b).[7] In this case, the prior allegedly inconsistent statement is an oral statement by Laura B. that was summarized in the police report of Deputy Faby. There were potentially two forms of extrinsic evidence available to defense counsel with respect to that oral statement that might be introduced to impeach Laura B.'s testimony on direct examination: (1) testimony by Deputy Faby about what Laura B. told him during the interview, and (2) Deputy Faby's written report summarizing that interview. Defense counsel chose to attempt to introduce only the latter form of extrinsic evidence.

The threshold question is whether introduction of Deputy Faby's written report would satisfy the requirements of Rule 5-613. That rule reads as follows:

---

[7]Rule 5-616 provides, in pertinent part:

**Rule 5-616. Impeachment and rehabilitation – Generally.**

(a) **Impeachment by inquiry of the witness.** The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at:

(1) Proving under Rule 5-613 that the witness has made statements that are inconsistent with the witness's present testimony; ...

(b) **Extrinsic impeaching evidence.** Extrinsic evidence of prior inconsistent statements may be admitted as provided in Rule 5-613(b). ...

18

**Rule 5-613.  Prior statements of witnesses.**

(a)  **Examining witness concerning prior statement.**
A party examining a witness about a prior written or oral statement made by the witness need not show it to the witness or disclose its contents at that time, provided that at the end of the examination (1) the statement, if written, is disclosed to the witness and the parties, or if the statement is oral, the contents of the statement and the circumstances under which it was made, including the persons to whom it was made, are disclosed to the witness and (2) the witness is given an opportunity to explain or deny it.

(b) **Extrinsic evidence of prior inconsistent statement of witness.**  Unless the interests of justice otherwise require, extrinsic evidence of a prior inconsistent statement by a witness is not admissible under this Rule (1) until the requirements of section (a) have been met and the witness has failed to admit having made the statement and (2) unless the statement concerns a non-collateral matter.

Parsing this rule to determine the basic conditions that must be satisfied in order for a party to offer extrinsic evidence of a prior allegedly inconsistent oral statement of a witness, we derive the following checklist:

1.	*The content of the statement and the circumstances under which it was made, including the person(s) to whom it was made, must be disclosed to the witness who is being impeached before the end of that witness's examination.  Rule 5-613(a)(1), (b)(1).*

Here, defense counsel asked Laura B. about the allegedly inconsistent oral statement during his cross-examination of her, disclosing both the circumstances of the statement (her interview with Deputy Faby), and the person to whom it was made (Deputy Faby).  This requirement of the rule was satisfied.

19

*2.      The witness to be impeached must be given an opportunity to explain or deny the allegedly inconsistent statement.  Rule 5-613(a)(2), (b)(1).*

During the cross-examination of Laura B., she was given the opportunity to explain or deny the statement.  She denied that she told Deputy Faby that she "had" Mr. Brooks over to her house at 7:30 p.m. that evening.  This requirement of the rule was satisfied.

*3.      The witness must have "failed to admit having made the statement."  Rule 5-613(b)(1).*

During cross-examination, Laura B. denied having made the allegedly inconsistent portion of the statement.  This requirement of the rule was satisfied.

*4.      The statement must concern "a non-collateral matter" – in other words, the content of the statement must not be "collateral" to the issues at trial.  Rule 5-613(b)(2).*

The defense contended that the sexual encounter between Mr. Brooks and Laura B. was consensual and not a rape.  The alleged inconsistency in the prior oral statement summarized in Deputy Faby's report concerned whether Mr. Brooks was in Laura B.'s house that evening at her invitation and not as an intruder, as she had testified.  Although the alleged prior oral statement was not directly inconsistent with the allegation of rape, it was not collateral to the issues at trial.  This requirement of the rule was satisfied.

Thus, the foundational requirements under Rule 5-613(b) for the introduction of extrinsic evidence of the prior allegedly inconsistent statement of Laura B. were met.  But there remains the question of the appropriate form of that extrinsic evidence.

20

*Form of Extrinsic Evidence under Maryland Common Law*

Had defense counsel offered Deputy Faby's *testimony* as extrinsic evidence of Laura B.'s prior allegedly inconsistent statement, our analysis would be brief. Deputy Faby's testimony would have been admissible under Rule 5-613(b). *See, e.g., Hardison v. State*, 118 Md. App. 225, 702 A.2d 444 (1997) (officer's testimony regarding an eyewitness's statement to him was admissible as extrinsic evidence of the witness's prior inconsistent statement). Instead of eliciting the statement as part of Deputy Faby's testimony, however, the defense elected to offer the police report as extrinsic evidence of Laura B.'s prior allegedly inconsistent oral statement.[8]

Prior to the adoption of the Maryland Rules of Evidence, it was well established that a witness could be impeached by extrinsic *written* evidence of a prior allegedly inconsistent *oral* statement if the written evidence was a verbatim transcription of the witness's oral statement or if the witness had adopted or approved the written version. This principle was discussed in two 1990 cases involving discovery of police interview notes or reports for the purpose of impeachment of prosecution witnesses. *See Collins v. State*, 318 Md. 269, 289,

---

[8]As a matter of trial tactics, this choice is perfectly understandable. The written version of the statement was already known and, although it did not completely support the defense version of events, was at least compatible with part of the defense. Attempting to prove the prior oral statement through cross-examination of Deputy Faby would be subject to the usual vagaries of live testimony, including the potential qualification or interpretation by Deputy Faby of the written version in a way that might turn out to be completely incompatible with the defense theory.

21

568 A.2d 1, *cert. denied*, 497 U.S. 1032 (1990); *Bruce v. State,* 318 Md. 706, 569 A.2d 1254 (1990), *appeal after remand*, 328 Md. 594, 616 A.2d 392, *cert. denied*, 508 U.S. 963 (1993).

In *Collins*, the defendant, who was convicted of murder in a jury trial, argued that the trial court had erred in ruling that the defense was not entitled to obtain written notes of a statement made by a State witness and recorded by a detective, prior to the cross-examination of the witness. This Court affirmed the trial court's ruling that the witness's statement "paraphrased in the police report" was not discoverable, stating, "[The witness] neither signed, adopted [n]or approved of the facts contained in the summary. The detective drafted the report subsequent to the actual interview.… If the witness has not expressly approved of the statements, it would be unfair for the evidence to be used for impeachment purposes." 318 Md. at 289. In *Bruce*, this Court addressed a similar discovery issue, and held that "it is obvious that a witness could not be impeached with the police officer's notes which were never adopted by or approved by the witness." 318 Md. at 725.

Although the type of police report at issue in *Collins* and *Bruce* is now discoverable under the amended Rule 4-263,[9] the Court's discussion of the admissibility of police reports for the purpose of impeaching a witness in those cases remains applicable to our analysis. While both *Collins* and *Bruce* were decided prior to the adoption of Title 5 of the Maryland

_____

[9]Rule 4-263 governs discovery in criminal cases in the circuit courts. Rule 4-263(d) requires the State's Attorney to disclose "[a]ll written and all oral statements of the defendant" as well as "all written statements of the witness that relate to the offense charged." The definition of "written statement" that was adopted in 2008 includes "a statement in a police or investigative report." Maryland Rule 4-263(b)(6)(C).

Rules, we take into account common law principles on the same subject matter when interpreting the rules of evidence set forth in Title 5. "[A]bsent a clear indication to the contrary, we shall assume that the [new] rule [of evidence] 'was not intended to amend, nullify, or supersede the common law.'" *Holmes v. State*, 350 Md. 412, 422, 712 A.2d 554 (1998) (citation omitted).

The Court of Special Appeals' opinion in *Hardison* further supports the application of the common law principle that a written summary of a witness's statement must be adopted or ratified by the witness – at some point, although not necessarily at trial – in order for the written version to be admitted into evidence for the purpose of impeaching the witness. In *Hardison*, a defendant was on trial for assault with intent to murder. The State's theory was that the defendant had deliberately shot the victim while the defense theory was that the shot had been fired accidentally while the victim and the defendant were struggling to gain control over the gun. An eyewitness to the altercation testified at trial that the defendant had pulled out a gun and shot the victim. Defense counsel attempted to impeach the witness by asking him whether he had told a police officer that the shot accidentally went off during a struggle between the defendant and the victim; the witness denied making the statement. The State called the police officer who had conducted the interview with the eyewitness and had incorporated the witness's statement into his police report. On cross-examination, in an effort to impeach the witness, defense counsel asked the officer whether the witness had told him that the defendant and the victim were "wrestling when the two

23

shots were fired." 118 Md. App. at 233. The State objected to the question, and the trial court sustained the objection on the basis that the officer's answer to the question would be hearsay.

At issue on appeal in *Hardison* was the admissibility of the officer's testimony regarding what the witness had told him. The Court of Special Appeals held that "[t]he fact that [the witness] did not read, approve, or adopt [the officer's] written report did not insulate him from being impeached with his own oral statement," and concluded that, under Rule 5-613(b), the officer's testimony as to what the witness told him during the interview was admissible as a prior inconsistent statement for the purpose of impeaching the witness. 118 Md. App. at 241.

While the court did not rule on the admissibility of the officer's written report – the type of extrinsic evidence at issue in this case – the court analyzed the admissibility of such a report: "When a person other than the witness reduces the witness's spoken words to writing, and the witness ratifies the writing by signing, adopting, or approving it , the writing will be treated as it if had been prepared by the witness himself.... Thus, if [the witness] had ratified [the officer's] report, it could have been treated as if it had been written by [the witness] and used to impeach him, under Rule 5-613." 118 Md. App. at 241. Notably, the court cited *Collins* and *Bruce* in its analysis. While neither *Collins*, *Bruce* nor *Hardison* offer dispositive authority on the issue in the present case, they strongly suggest that if a written version of a witness's oral statement is not substantially verbatim, it must have been either

24

adopted or approved by the witness at some time in order to be admitted into evidence for

the purpose of impeaching the witness.

*Case Law under Federal Rule 613 and Analogous Rules*

Maryland Rule 5-613 is based on Federal Rule of Evidence 613. *See* A. D. Hornstein,

*The New Maryland Rules of Evidence: Survey, Analysis and Critique*, 54 Md. L. Rev. 1032,

1033 (1995).[10] Federal cases applying Rule 613 can be instructive, as can cases from other

jurisdictions that have adopted analogous rules.[11]

In applying the analogous federal rule, federal courts have held that a witness may be

impeached with written extrinsic evidence of a prior inconsistent oral statement only if the

written evidence is a substantially verbatim version of the oral statement or if the witness

---

[10]In creating Title 5 of the Maryland Rules of Practice and Procedure in 1994 and adopting Maryland Rules of Evidence, the drafters used the Federal Rules of Evidence as a starting point. Hornstein, *supra*, at 1033. The rules ultimately adopted in Title 5 "differ in a few significant ways from the Federal Rules of Evidence. The differences, however, are less matters of substance than clarifications of what had been intended, though not as artfully expressed, in the Federal Rules." *Id.* Professor Hornstein, who was the Special Co-Reporter and Special Consultant to Evidence Subcommittee of the Rules Committee, explained that: "Because so many jurisdictions have adopted evidence rules modeled on the Federal Rules, the body of law available on evidentiary questions that share the federal format has expanded substantially the base of wisdom and experience in evidentiary matters…. Although no jurisdiction is bound by the decisions of others and each jurisdiction may have departed from the precise language of the Federal Rules, the value of such a large body of persuasive authority is impressive." *Id.* at 1034.

[11]The Maryland rule differs from the federal rule in one respect – under the Maryland rule, the witness to be impeached must be given an opportunity to address the allegedly inconsistent statement. *See* Hornstein, *supra*, at 1055 ("Unlike the Federal Rule, under the Maryland Rule extrinsic evidence of the prior inconsistent statement is not admissible until this requirement has been met and the witness has denied the statement"). That requirement is not at issue in this case.

25

previously adopted or ratified the written version. For example, in *United States v. Almonte*, 956 F.2d 27 (2d Cir. 1992), a defendant was on trial for conspiring to distribute heroin. Drug Enforcement Administration ("DEA") agents testified that they had questioned the defendant and the co-defendant separately, and that each had given self-incriminating responses. 956 F.2d at 28. The defendant sought to discredit the agents' testimony about these admissions by introducing notes that an Assistant United States Attorney had made during a debriefing of one of the agents. In the notes at issue, the Assistant United States Attorney recorded one of the DEA agents' recollection of the defendant's admission. Specifically, he wrote:

> [CO-DEFENDANT]- I organized it. I put money together. ½ unit for 50,000 grand. Almonte works for me…
>
> [DEFENDANT]- Yeah, that's right.

*Id.* at 29. Defense counsel argued that the notes, including the notation "Yeah, that's right," were a verbatim record of what the defendant told the agent, and that they could therefore be used to impeach the agent's testimony at trial that the defendant was questioned separately from the co-defendant. The government opposed the introduction of the notes. Outside the presence of the jury, the Assistant United States Attorney testified that the notes were not a verbatim transcript, but rather a shorthand summary of the DEA agent's statements, and that he wrote the words "yeah, that's right" as a "shorthand way for [him] to remember that the substance of [the defendant's] statement was the same as [the co-defendant's] statement." *Id.* The trial court declined to admit the notes as a prior inconsistent statement to impeach the DEA agent.

26

On appeal, the Second Circuit affirmed the trial court's ruling, holding that a "'third party's characterization' of a witness's statement" does not constitute a prior statement of that witness unless the witness has subscribed to that characterization or it is a verbatim transcript of the witness's own words. *Id.* at 29. The court explained the rationale for the rule: "The problem, in essence, is one of relevancy. If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible." *Id.*

The Eleventh Circuit reached a similar conclusion in *United States v. Saget*, 991 F.2d 702 (11th Cir.), *cert denied*, 510 U.S. 950 (1993). In that case, the defendant was on trial for conspiracy to distribute crack cocaine. Defense counsel attempted to impeach a government witness on cross-examination by reading from an FBI report that summarized the witness's prior allegedly inconsistent oral statement. The trial court refused to allow defense counsel to impeach in that manner, although it did permit the defense to question the agent who had conducted the interview later in the trial concerning the allegedly inconsistent statements. 991 F.2d at 710.

On appeal, the Eleventh Circuit considered whether a witness could be impeached pursuant to Rule 613 by an attorney *reading* from an FBI report. 991 F.2d at 710. In affirming the trial court's application of Rule 613, it relied on the same rationale as our common law evidentiary decisions in *Bruce* and *Collins*: "Under the Jencks Act, non-verbatim summaries of a witness's prior oral statements are excluded from mandatory

27

production because it would be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness's own rather than the product of the investigator's selections, interpretations and interpolations.... For the same reasons, we conclude that a witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own." 991 F.2d at 710.

Relying on *Almonte* and *Saget*, courts have held that a written report summarizing a witness's prior inconsistent oral statement cannot be admitted into evidence to impeach the witness if the report is not substantially verbatim or has not been approved of or adopted by the witness as accurate. *See, e.g.*, *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1216 (11th Cir. 2010) (affirming the trial court's decision not to admit an FBI summary of a witness's interview on the basis that a witness may not be impeached by a non-verbatim version of a prior oral statement unless it can be fairly said that the version is the witness's own statement); *State v. Graham*, 764 N.W.2d 340, 352 (Minn. 2009) ("[I]f the witness has not adopted the statement attributed to him as his own, counsel may not offer extrinsic evidence in the form of reading verbatim from a third-party summary to impeach the witness"); *cf. United States v. Barile*, 286 F.3d 749, 757-58 (4th Cir. 2002) (holding that FDA documents containing a witness's prior inconsistent statement may be admitted to impeach a witness but only after the court determines that the witness "has adopted the statements or whether they can be otherwise attributed to her"); *United States v. Strother*, 49

F.3d 869, 875 (2d Cir. 1995*)* (holding that a memorandum containing a witness's prior inconsistent statement was admissible to impeach the witness even though the witness did not draft the memorandum herself because the witness "signed it and confirmed that she had discussed the memorandum" and noting that "a third party's characterization of a witness's statement can constitute a prior statement of the witness where the witness has 'subscribed to that characterization.'").[12]   At least one state court has adopted a rule to that effect.  *See* Ohio Criminal Rule 16(B)(6) (requiring that prosecution provide defendant with reports by law enforcement officers with the proviso that "a document prepared by a person other than the witness testifying will not be considered to be the witness's prior statement for purposes of cross-examination of that particular witness ... unless explicitly adopted by the witness").

We have found two contrary decisions by courts in other states construing rules similar to Rule 5-613.  In *State v. Reid*, 164 S.W.3d 296 (Tenn. 2005), the Supreme Court of Tennessee considered whether a trial court had properly excluded the written summaries

_____

[12]Similarly, many courts have prohibited counsel from impeaching a witness by *reading* from a report summarizing or paraphrasing the witness's prior inconsistent statement. *See, e.g.*, *United States v. Adames*, 56 F.3d 737, 744-45 (7th Cir. 1995) (trial court properly refused to allow counsel to impeach a witness by reading from an agent's report summarizing the witness's prior inconsistent statement because the witness "testified he did not adopt the statement, did not write and could not say that what was in it was everything he had told the agents"); *State v. Linder*, 2002 WL 31123855 at *2 (Oh. Ct. App. 2002) ("A summary of a witness's oral conversation becomes a witness's statement only if she has reviewed and signed, or otherwise adopted it, or if it is a nearly verbatim account as opposed to being merely the investigator's own selections ...."); *People v. Hood*, 593 N.E.2d 805, 812 (Il. Ct. App. 1992) ("A witness cannot be impeached by a statement that is not in her own words or substantially verbatim").

of a police officer as extrinsic evidence for impeachment of two witnesses under Tennessee Rule of Evidence 613, which, like Rule 5-613, is based on the like-numbered Federal Rule of Evidence. In that case, the defendant was convicted of, among other things, the murder and aggravated robbery of two ice cream store employees. At trial, one witness testified that she saw a car similar to the defendant's car near the store, and another witness testified that he saw a car similar to the defendant's car near the park where the bodies of the employees were found. Defense counsel sought to impeach the witnesses' testimony by calling the officer who interviewed them and sought to introduce into evidence the police reports summarizing his interviews with the witnesses. The trial court denied defense counsel's motion to admit the reports.

On appeal, the Tennessee Supreme Court held that the trial court erred in excluding the summaries. It held that "the 'only requirement' for the use of extrinsic evidence is that the witness must be 'afforded an opportunity to explain or deny.' The extrinsic evidence may be the written or recorded content of the prior statement itself or the testimony of another witness as to the content of the prior written or oral statement." 164 S.W. 3d at 313-14.[13] The court noted that Tennessee Rule 613 "does not expressly limit the impeaching party to

_____

[13]The court in *Reid* quoted and relied on commentary provided by the Advisory Commission on the Tennessee rules that the rule stated the "only requirement" for the use of extrinsic evidence for impeachment of a witness with a prior inconsistent statement. 164 S.W.3d at 313-14. Neither the federal rule nor our rule was accompanied by similar commentary.

30

one form of extrinsic evidence, nor does it require an impeaching party to choose between two available forms of extrinsic evidence." *Id*. at 314.

Similarly, in *State v. Arrington*, 738 So.2d 1087 (La. Ct. App. 1999), the intermediate appellate court in Louisiana held that a police report summarizing an officer's interview with the victim's daughter was admissible as extrinsic evidence of a prior oral statement of the daughter inconsistent with her trial testimony. In that case, the defendant was on trial for aggravated battery of his wife. His daughter testified that the defendant was armed with a knife, which he used to stab his wife. After the daughter testified, defense counsel sought to have the jury review a police report stating that the daughter had indicated that the defendant was armed with a screwdriver. The court held that because the foundation requirement had been met, the trial court should have admitted the report into evidence. *Id.* at 1093.

*Summary*

We find persuasive the rationale suggested in our prior decisions in *Bruce* and *Collins* as well as the Eleventh Circuit's decision in *Saget* – that it would be unfair to impeach a witness with a statement "which could not fairly be said to be the witness's own rather than the product of the investigator's selections, interpretations, and interpolations." We hold that a witness may not be impeached with extrinsic written evidence of a prior allegedly inconsistent oral statement, unless the written evidence is a substantially verbatim version of the oral statement or was previously acknowledged by the witness as an accurate version.

Although in this case, the prosecutor, and to some extent the trial court, were focused on the wrong rule (Rule 5-802.1), the defense would have satisfied the requirements for admission under Rule 5-613(b), if it had satisfied the more stringent requirements of Rule 5-802.1. In any event, defense counsel did not establish that the statement in Deputy Faby's report was a substantially verbatim version of Laura B.'s statement to the deputy, nor had Laura B. previously acknowledged it as an accurate version. It would have been unfair to admit the written report into evidence and impeach Laura B. with what could be Deputy Faby's own "selections, interpretations, and interpolations" of what Laura B. had told him about the events of that night. The trial court properly excluded the police report.[14]

## C. *Whether the Trial Court Should Have Struck the SAFE Nurse's Statement*

We next consider whether the trial court should have struck the testimony of the SAFE nurse that the findings from her physical examination of Laura B. "would verify" what Laura B. told her about her encounter with Mr. Brooks.

*Nurse Harden's Testimony*

After she was qualified as an expert in sexual assault forensic examinations, Nurse Harden testified about her examination of Laura B. at the hospital, including her interview

---

[14]In his brief, Mr. Brooks argues that it is illogical to require the witness to both adopt the statement authored by a third party and deny the statement – one of the requirements of Rule 5-613. Mr. Brooks' argument appears to assume that the witness must adopt the statement at trial. That is not required, however. For purposes of Rule 5-613, Laura B. could have approved the statement or adopted the written summary at any time prior to the trial and during or after the interview.

32

of Laura B. and the physical injuries she observed on Laura B. Nurse Harden explained that

the interview was part of the examination because "I'm looking for a number of things both

medically and forensically, and it focuses me in on what I am looking for, what I need to

treat." Her interview notes summarized what Laura B. told her, including that Mr. Brooks

had appeared beside her bed while she was napping and demanded sex; that Laura B. had hit

him with a ceramic statue; that, in response, Mr. Brooks had choked her, had forced her to

have sex with him, and had then followed her around the house; and that she had contacted

the police by dialing 911, and waited for the 911 operator to return her call. Nurse Harden's

notes concerning the interview were admitted into evidence over a defense objection.

Nurse Harden then described the diagrams on which she noted Laura B.'s injuries, and

35 photographs of Laura B. that documented extensive bruising and lacerations on her face,

body, and genitals.[15] At the conclusion of her direct examination, the following exchange

took place:

> [ASSISTANT STATE'S ATTORNEY]: Mrs. Harden, given
> your training as a forensic nurse examiner, were you able to
> draw a conclusion based upon a reasonable degree of medical

---

[15]Using the photographs and other demonstrative exhibits, Nurse Harden testified in detail about the following injuries she observed on Laura B.: blood, lacerations, and bruising on the side of her face, forehead, cheeks, nose, ears, and lips; bruising and swelling around her eyes; bruising on her neck and hairline; bruising on her arms and blood around her fingernails; abrasions on her forearm and upper back; blood, scratches, and bruising on her knees and thighs; discoloration (purplish in color) and bruising on her labia; "very profound" injuries to her labia majora, labia minora, posterior fourchette, including a laceration; discoloration and bruising on her cervix; and hemorrhaging within her vagina.

certainty as to whether what [Laura B.] told you in the interview was consistent or inconsistent with the injuries that you observed?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[NURSE HARDEN]: What I found during my examination would verify the story that she told me.

[DEFENSE COUNSEL]: Objection. Ask it be stricken.

THE COURT: Overruled.

On cross-examination, defense counsel asked Nurse Harden about her analysis of Laura B.'s injuries, including whether they could have been caused by aggressive consensual sex. Nurse Harden replied, "In this case, no, it cannot." Nurse Harden explained that "no woman [involved in the studies she had read as part of her training] has ever had injury to more than one area during sex – anticipated sex." Upon further questioning by defense counsel on re-cross-examination, Nurse Harden conceded that only one study showed that none of the women examined after consensual sex had injuries in more than one area of their genitalia. Nurse Harden agreed that she had no personal knowledge of the cause of the injuries to Laura B.'s genitalia.

*Vouching for Credibility versus Assessing Consistency with Other Evidence*

This Court has previously drawn a distinction between circumstances in which a witness expresses an opinion that simply vouches for the the credibility of another witness, and situations in which a witness assesses whether a statement of another witness is

34

consistent with other facts known to the testifying witness. An example of the former is found in *Bohnert v. State*, 312 Md. 266, 539 A.2d 657 (1988); an example of the latter is found in *Conyers v. State*, 354 Md. 132, 729 A.2d 910 (1999). The State urges us to follow *Conyers* in this case while Mr. Brooks argues that *Bohnert* is the more pertinent precedent.

*Bohnert*

In *Bohnert*, this Court held that expert testimony is inadmissible as a matter of law when it directly assesses the credibility of another witness. In that case, a child under the age of 14 accused her mother's boyfriend of sexual abuse. The credibility of the victim was the central issue at trial because there was evidence that the child may have had improper motives for accusing the boyfriend, the child recanted her allegations and then confirmed them during her testimony, and there was no physical evidence to support the allegations. The State called a social worker, who was qualified as an "expert in the field of child sexual abuse." 312 Md. at 271. The State asked the social worker whether she had "an opinion as to whether or not this child…was sexually abused," to which the social worker answered, "It's my opinion, based on the information that [the victim] was able to share with me, that she was, in fact, a victim of sexual abuse." *Id.*

The Court noted that cross-examination of the social worker revealed that her opinion was based on her interviews with the victim, the victim's mother, and "other people"; and that the State emphasized that social worker's testimony in both its opening and closing arguments. 312 Md. at 271-74. The Court held that the trial court abused its discretion in

35

admitting the social worker's opinion because her opinion was "not based on facts sufficient to form a basis for her opinion." *Id.* at 276. The Court also provided an "alternative reason" for its holding, stating that "the [social worker's] opinion was inadmissible as a matter of law because it invaded the province of the jury in two ways. It encroached on the jury's function to judge the credibility of the witnesses and weigh their testimony and on the jury's function to resolve contested facts." *Id.* at 279. The Court held: "a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law." *Id.* at 278. Because the social worker's testimony that the victim "in fact was sexually abused was tantamount to a declaration by her that the child was telling the truth and that [the defendant] was lying," the testimony was inadmissible. *Id.* at 278-79. *See also Hutton v. State*, 339 Md. 480, 504, 663 A.2d 1289 (1995) (in a trial concerning alleged child sexual abuse, testimony by an expert psychologist that the alleged victim suffered post-traumatic stress disorder as a result of sexual abuse was inadmissible, although such testimony might be admitted to show lack of consent when the sexual contact itself was not at issue).

*Conyers*

In *Conyers*, the defendant was charged with, among other things, the premeditated murder of his estranged girlfriend's mother. A former cellmate of Conyers named Johnson testified that Conyers told him that he had gone to the victim's house for the purpose of committing a burglary and had ended up shooting the victim. Defense counsel attempted to

36

undermine Johnson's credibility by showing that Johnson had a plan to reduce his prison time on pending charges by testifying against other inmates. 354 Md. at 152. In support of this theory, defense counsel asked Johnson whether he had rifled through Conyers' charging documents, and called two other cellmates who testified that they had seen Johnson looking through either their own case files or displaying to them the documents of other prisoners. In response, the State called as a rebuttal witness a detective who had interviewed Johnson. The State asked the detective whether there was any information that Johnson had given the detective that was "above and beyond that which was contained" in the charging documents and the search warrant. *Id.* The detective answered that there were a significant number of factual statements made by Johnson that were not in those documents, stating, "These statements which I knew upon hearing them from Mr. Johnson to be truthful, and I was able to verify each and every statement that he gave us." *Id.* at 153.

On appeal, the defendant argued that the detective's rebuttal testimony should have been excluded under *Bohnert*. The Court of Appeals held that the issue was not preserved for review. In an alternative holding, the Court stated that *Bohnert* was distinguishable because the detective "was not offering an opinion as to ... Johnson's credibility as a witness." 354 Md. at 154. Instead, the Court noted, "[the detective] was stating that certain information ... Johnson had supplied him with prior to trial was not contained in [Conyers'] papers and, because he was able to confirm that information, he regarded it as accurate and, therefore, truthful." *Id.* The Court also noted that the purpose of the detective's testimony

37

was twofold: (1) "to demonstrate that ... Johnson could only have obtained some of this information from [Conyers] himself and not from 'rifling through' documents," and (2) "to show that some of [Conyers'] information was known only to the killer and those investigating the murder, and thus Johnson could only have learned the information from the person who committed the murder." *Id.* The Court concluded that the detective's testimony "did not invade the province of the jury, which is charged with determining the credibility of witnesses and the weight to accord their testimony." *Id.*

*Conyers* does not stand for the proposition that a witness may testify that another witness told the truth. The Court explicitly disclaimed such a holding, concluding that the detective was not offering opinion as to Johnson's credibility as a witness generally. Rather, the detective was testifying that certain information provided to him by Johnson was confirmed by other information known to the detective – and not available from Conyers' charging papers. Such testimony, the Court held, did not invade the jury's function of determining the credibility of witnesses.

*The Prosecutor's Question*

In the instant case, the prosecutor asked Nurse Harden an open-ended question – whether the account that Laura B. had given the nurse during the examination was "consistent or inconsistent with" the injuries she observed on Laura B. Unlike the question posed to the social worker in *Bohnert*, this question did not ask Nurse Harden to reflect generally on Laura B.'s credibility. Rather, the question asked the nurse to compare Laura

B.'s statement to other evidence directly observed by the nurse – Laura B.'s injuries. Given

that a person's physical condition might be "consistent with" several versions of the past, the

question did not require Nurse Harden necessarily to endorse any particular version of the

truth. An answer that the injuries she observed were "consistent with" Laura B.'s statements

to her would mean Laura B.'s version was not excluded from the set of possible explanations

of her physical condition.[16] (Indeed, the defense cross-examination of Nurse Harden

attempted to show that the injuries could be "consistent with" Mr. Brooks' version of events).

In that case, the nurse's testimony would serve as corroboration of other evidence heard by

the jury – primarily Laura B.'s testimony – and thus was effectively qualified or conditioned

on the jury's acceptance of that evidence. *See Hall v. State*, 107 Md.App. 684, 693-95, 670

A.2d 962, *cert. denied*, 342 Md. 473 (1996) (although an expert may not testify as to personal

belief in the testimony of another witness, an expert may testify whether the expert's

observations are consistent with the disputed testimony).[17]

---

[16] On the other hand, an answer that the injuries were "not consistent" with Laura B.'s statement to her would have suggested that Laura B.'s version was not correct.

[17] Mr. Brooks cites a number of cases from other states in which courts have held inadmissible testimony by psychologists or social workers that a child's behavior or statements are "consistent with" having been sexually abused. *See, e.g.*, *State v. Moran*, 728 P.2d 248, 254-56 (Ariz. 1986); *Nelson v. State*, 782 P.2d 290, 299 (Alaska App. 1989); *State v. Chamberlain*, 628 A.2d 704, 707 (N.H. 1993). In context, the testimony found inadmissible in those cases was more analogous to the testimony elicited by the general question posed in *Bohnert*, unlike in this case where the question asked about the consistency of Laura B.'s statement to the nurse with the nurse's observation of her *physical* injuries.

In our view, the State's question was permissible and the trial court properly overruled the defense objection to that question.

*The Nurse's Answer*

Had Nurse Harden simply answered the prosecutor's question in the way it was asked – that is, whether Laura B.'s statements to her were "consistent or inconsistent with" the injuries she observed – Nurse Harden's answer would have been clearly admissible. But she did not. Instead, she stated that the physical injuries she observed "would verify" what Laura B. had told her. Considered in isolation, the word "verify" – which traces its origin to the Latin word for "truth"[18] – might well suggest that the nurse had assessed Laura B.'s statement to her to be the one true version of events.

On the other hand, to hear Nurse Harden's answer as the jury and trial court did, one must consider it in the context they heard it and not focus on a single word. The verb "verify" did not appear alone in Nurse Harden's answer but was qualified by the auxiliary verb "would," which introduced a degree of conditionality to her testimony.[19] In context, the

_____

[18]Oxford Latin Desk Dictionary (rev. ed. 2005) at 202 ("veritas").

[19]Used as an auxiliary verb, "would" expresses "contingency" or "possibility." *See* Webster's Third New International Dictionary Unabridged at 2638, 5(a) (2002). Verb constructions that use "would" as an auxiliary verb are also sometimes referred to as the "conditional mood." *See* <http://www.oxforddictionaries.com/words/moods>. In Nurse Harden's testimony, the use of the word "would" qualifies the verb "verify" with an unstated condition. In context, the condition would appear to be the jury's willingness to accept Laura B.'s version of events – *i.e.,* the nurse's physical examination "would verify" Laura B.'s statement assuming the jury ultimately found that statement to be a credible version of events. At the very least, the nurse's use of this qualifying phrase expressed a reticence about invading the jury's province of deciding the facts.

40

nature of that condition is readily apparent. The prosecutor's question required an either-or answer – that is, either (1) the account that Laura B. gave to the nurse during the examination "consistent" with Laura B.'s injuries or (2) it was "inconsistent." It was clear, in context, that the nurse chose option (1), although she expressed it in terms of a synonymous verb phrase. This was not an instance where the witness responded to a question with an irrelevant answer or embellished an answer beyond a reasonable response to the question.

Unlike the social worker's testimony in *Bohnert*, Nurse Harden's testimony was based on a comparison of her observations of the complaining witness's physical condition with the statements of that witness and not simply an assessment of the witness' general credibility based on an interview. The most significant part of the nurse's testimony –indeed, virtually all of her testimony aside from her professional qualifications – was her description and documentation of Laura B.'s injuries. One need not be an expert in the investigation of sexual assaults to know that extensive bruising and lacerations throughout a woman's face and body, including profound "blunt force trauma" to her genitalia, would be consistent with a violent sexual assault.[20] The nurse's affirmation that Laura B.'s statements matched her

[20]Indeed, in the State's closing argument, the prosecutor spent a significant amount of time reminding the jury of Laura B.'s injuries, as described by Nurse Harden and documented in photographs and other evidence, to make the obvious point that they corroborated Laura B.'s testimony. The prosecutor did not even mention the nurse's statement that those injuries "would verify" Laura B.'s account.

physical condition was hardly surprising. At that point in the trial, no other theory explaining those injuries had been presented to the jury.[21]

Even if it was error for the trial court not to strike Nurse Harden's use of the word "verify" in her answer, we have no difficulty finding that it was harmless error. This Court has described the standard of review for harmless error:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, *beyond a reasonable doubt, that the error in no way influenced the verdict*, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict.

*Dorsey v. State,* 276 Md. 638, 659 (1976) (emphasis added).

In this case, at worst, the alleged error consisted of one brief answer in a lengthy examination – an answer in which a witness responded to an appropriate question and used a verb that was not quite a synonym for the appropriate verb. The nurse's testimony was completely focused, on both direct and cross-examination, on her assessment of Laura B.'s physical injuries, and not some kind of assessment of Laura B.'s credibility generally. In the

---

[21] At that point in the trial, the defense had not explicitly proposed a defense that Laura B. had engaged in consensual sex with Mr. Brooks. (The defense counsel's opening statement, while stating that Mr. Brooks was innocent, was circumspect as to why that would be so). The theory that Laura B. and Mr. Brooks had engaged in consensual sex was subsequently raised in defense counsel's cross-examination of Nurse Harden and in Mr. Brooks' testimony in the defense case.

context of her direct testimony and the question that was put to her, it was apparent that Nurse Harden was essentially affirming that the injuries she observed on Laura B. were consistent – as opposed to inconsistent – with Laura B.'s statements to the nurse. It is inconceivable that the jury would believe that, in answering that question, Nurse Harden was providing general testimony comparing the credibility of Laura B. with that of Mr. Brooks, who, at that point, had not yet testified as to his version of events. Nor did the State argue that the nurse endorsed the complaining witness's credibility generally. The physical evidence, the 911 recording, the circumstances of Laura B.'s escape and of Mr. Brooks' apprehension generally corroborated Laura B.'s version of events. Mr. Brooks' version – that Laura B. had proposed to exchange sex for window-washing and had initiated the violence due to a one-day delay in completing that task – was incredible on its face. In these circumstances, there appears to be no reasonable possibility that the jury would think that the nurse was functioning as some kind of human polygraph that was assessing Laura B.'s general credibility.

## Merger of Rape and False Imprisonment Convictions

The jury returned verdicts of guilty as to first degree rape by threat, second degree rape, second degree assault, and false imprisonment. The Circuit Court merged Mr. Brooks' convictions for second degree rape and second degree assault into the first degree rape conviction for sentencing purposes. However, the court did not merge the false

43

imprisonment conviction and imposed a consecutive sentence for that offense. Mr. Brooks contends that the convictions should have been merged for sentencing purposes.

The merger of convictions for purposes of sentencing derives from the protection against double jeopardy afforded by the Fifth Amendment of the federal Constitution and by Maryland common law. *Nicolas v. State,* 426 Md. 385, 400, 44 A.3d 396 (2012). Merger protects a convicted defendant from multiple punishments for the same offense. *Id.* Sentences for two convictions must be merged when: (1) the convictions are based on the same act or acts, and (2) under the required evidence test, the two offenses are deemed to be the same, or one offense is deemed to be the lesser included offense of the other. *Id.* at 400-2; *State v. Lancaster*, 332 Md. 385, 391, 631 A.2d 453 (1993).

The Court of Special Appeals had occasion to consider whether a false imprisonment conviction merges into a rape conviction in *Hawkins v. State*, 34 Md. App. 82, 92, 366 A.2d 421 (1976). In that case, the defendant approached the victim in a wooded area, seized her by the throat, held a gun to her side, ordered her to undress and lie on the ground, and raped her. The court noted that the victim was detained only for the time necessary to complete the rape. Because "[a]ll of the facts necessary to prove the lesser offense were essential to proving the greater one," the court held that the defendant's conviction for false imprisonment merged into the rape conviction. *Id.* The court reasoned that "[t]o hold otherwise would be to hold that in every case of rape, a conviction for false imprisonment would also be proper," but noted that "confinement after or before the rape is committed

44

would preclude the merger." *Id.*

As the Circuit Court's instructions in the instant case also demonstrate,[22] the facts

---

[22]On the false imprisonment charge, the court instructed the jury:

> False imprisonment is the confinement or detention of a person against that person's will, accomplished by force or threat of force. In order to convict the defendant of false imprisonment, the State must prove:
>
> 1.      That the defendant confined or detained [Laura B.];
>
> 2.      That [Laura B.] was confined or detained against her will; and
>
> 3.      That the confinement or detention was accomplished by force or threat of force.

On the charge of first degree rape by threat, the court instructed the jury:

> In order to convict the defendant, the State must prove all of the elements of forcible second degree rape, and must also prove the defendant threatened or placed [Laura B.] in reasonable fear that [Laura B.] would be imminently subject to death, suffocation, strangulation, disfigurement, or serious physical injury.

On the charge of second degree rape, the court instructed the jury:

> Rape is unlawful vaginal intercourse with a female by force or threat of force and without her consent. In order to convict the defendant of second degree rape, the State must prove:
>
> 1.      That the defendant had vaginal intercourse with [Laura B.];
>
> 2.      That the act was committed by force or threat of force, and

45

necessary to prove a rape also prove false imprisonment for the period of the rape. In particular, in order to prove false imprisonment, the prosecution must prove the following three elements, each of which is also an element of a first degree rape conviction:

(1) that the defendant confined or detained the victim;
*as Hawkins indicated, confinement or detention of the victim is necessarily part of the proof of a rape*

(2) that the victim was confined or detained against the victim's will;
*a rape involves sexual intercourse without the victim's consent – i.e., against the victim's will*

(3) the confinement or detention was accomplished by force or threat of force;
*forcible second degree rape involves the use of force or threat of force*

Thus, if the jury convicted Mr. Brooks of false imprisonment for confinement *coincident with the rape*, the convictions merge for sentencing purposes.

The critical question as to merger in this case is thus whether the rape conviction and the false imprisonment conviction are based on the "same act or acts." Laura B.'s testimony in this case could support a finding that Mr. Brooks detained her against her will by force or threat of force – *i.e.*, falsely imprisoned her – before the rape when he beat and choked her in the bedroom and followed her to the living room, confining her to the house in anticipation of the rape, as well as after the rape when he followed her around the house and refused to

---

3. That the act was committed without the consent of [Laura B.].

let her leave. While the false imprisonment conviction could have reasonably been based on Mr. Brooks' actions separate from the rape itself, it is not readily apparent whether the jury actually came to that conclusion. In such circumstances, we are constrained by precedent from assuming that the two convictions were not based on the same act or acts. In particular, when the factual basis for a jury's verdict is not readily apparent, the court resolves factual ambiguities in the defendant's favor and merges the convictions if those convictions also satisfy the required evidence test. *Nicolas, supra,* 426 Md. at 410-413; *Snowden v. State*, 321 Md. 612, 618-619, 583 A.2d 1056 (1991); *Nightingale v. State*, 312 Md. 699, 708-709, 542 A.2d 373 (1988).

In *Nicolas,* police were called to investigate an alleged hit and run in Nicolas' neighborhood. According to the testimony of the officers, when they attempted to question Nicolas about the incident, he pushed and punched the officers. At that point, the officers indicated their intention to place him under arrest, after which an additional altercation occurred. At trial, Nicolas denied the initial attack. The jury found Nicolas guilty of both assault and resisting arrest.

This Court held that, in returning those guilty verdicts, the jury could have believed that the initial altercation – before the officers announced their intention to arrest Nicolas – either occurred or did not occur. The Court also found that, even if the jury believed that the initial altercation did occur, it could have found that it did not constitute a separate assault from assault following the officers' announcement of their intent to arrest Nicolas. After

47

examining the trial transcript, the jury instructions, and the verdict sheet, the Court determined that the record was ambiguous as to the factual basis on which the jury found Nicolas guilty of the assault charge. *Nicolas,* 426 Md. at 412. The Court held that, in resolving a question as to whether convictions should merge, an ambiguity as to the factual basis for a conviction should be resolved in the defendant's favor. Accordingly, the Court assumed that the factual bases for the assault and resisting arrest convictions were the same and held that the convictions merged. *Id.*

Similarly, in *Snowden*, this Court merged convictions for assault and battery into a conviction for robbery. In that case, the defendant entered a restaurant with the intent of robbing it. When the restaurant manager appeared, the defendant immediately shot the manager and subsequently demanded to know where he kept the money. The manager, with the defendant pointing a rifle at his back, led the defendant to the office where the money was located, and the defendant left the restaurant with $3,000. In a bench trial, the defendant was convicted of, among other things, robbery and assault and battery.

The State argued that the assault and battery conviction should not merge into the robbery conviction because there were two separate crimes – the shooting prior to the robbery and the robbery itself. This Court stated that the trial court's rationale for convicting the defendant of both robbery and assault and battery was not readily apparent: "We do not know whether the robbery charge was based on battery as a lesser included offense or on assault as a lesser included offense with the battery considered separate." 321 Md. at 619.

48

The Court noted that "had it been a jury trial we could have looked to the judge's instructions in hope of illuminating the rationale behind the verdicts. Because the case was tried by the court, we must look to the judge's rationale for the convictions." *Id.* Because the trial court could have based the convictions for assault and battery on the same acts as the robbery and any ambiguity must be resolved in favor of the defendant, the Court held that the convictions for assault and battery merged into the conviction for robbery.

Here, as in *Nicolas*, the jury may, or may not, have found that a detention of Laura B. before or after the rape was the basis for the false imprisonment conviction. Laura B. testified that Mr. Brooks choked her before the rape, but Mr. Brooks denied doing so. Laura B. testified Mr. Brooks was "right behind me ... like my shadow" after the rape, but Mr. Brooks denied trying to keep her from leaving her home, and said he did not remember following her around the house. Even if the jury found that a detention did occur before or after the rape, the jury may have not relied upon it as the basis for Mr. Brooks' false imprisonment conviction.

We look to the record for other indications that might resolve the ambiguity in favor of non-merger. As suggested in *Snowden*, we have examined the jury instructions.[23] While

_____

[23] In addition to jury instructions, the verdict sheet can be examined by a reviewing court. Here, the Circuit Court provided the jury with a general verdict sheet. In cases in which there could be an issue as to merger, a trial court could provide the jury with a special verdict sheet. For example, in this case, a special verdict sheet might have stated something like: "Answer the following question if and only if you find the defendant guilty of both first degree rape and false imprisonment. Did the false imprisonment occur before, during, or after the first degree rape? Circle 'before,' 'during,' or 'after.' Again, do not answer this

49

the court's instructions properly defined the charged offenses in accordance with pattern jury instructions, they did not specify that the jury must find that detention occurred either prior to or after the rape to convict Mr. Brooks of false imprisonment if it also convicted him of rape. There was no specific reference to detention before or after the rape in the jury instructions.

In the State's closing argument in this case, the prosecutor appeared to identify the entire period of time that Mr. Brooks was with Laura B. in her house as the period of false imprisonment. He told the jury:

> The false imprisonment count. Requirements for that is that the defendant confined or detained the victim against her will using force or threat of force. The fact that he wouldn't let her out of his sight, he wouldn't let her out of the bedroom, he followed her everywhere that she wanted to go in the house, specifically told her she couldn't use the phone or call the police, these are all indications that he meant to keep her where she was in the bedroom. She wasn't free to leave. She wasn't even free to make a phone call.

While this argument invited the jury to consider the entire period of the encounter between Laura B. and Mr. Brooks that evening in relation to the false imprisonment count, the prosecutor did not suggest that the jury should consider the time before or after the rape separately in considering the false imprisonment count.

---

question if you find the defendant not guilty of either first degree rape or false imprisonment."

50

Finally, we note that, during its deliberations, the jury sent a question to the judge asking "Is false imprisonment time dependent?  If the victim was restrained for a brief moment, is that considered false imprisonment?"  The trial court responded by referring the jury to its memory of the evidence in light of the instructions of the court.  While we are loath to draw any conclusions concerning a jury's factual determinations from a question posed to the judge during deliberations, it is difficult to infer from this question that the jury was specifically focused on a time period separate from the rape itself.

Because the precise factual basis of the jury's conviction of Mr. Brooks of false imprisonment is not readily apparent and any factual ambiguities must be resolved in favor of the defendant, we must assume that the false imprisonment conviction was based on the same facts as the rape conviction – that is, the detention of Laura B. during the rape.  As indicated above, under the required evidence test, all the elements of the offense of false imprisonment are included in the elements of the offense of first degree rape.  Therefore, the two offenses must merge for sentencing purposes.

## Conclusion

For the reasons stated above, we hold:

1.      Written extrinsic evidence of a prior inconsistent oral statement of a witness is admissible at trial for the purpose of impeachment of the witness if the proponent of the evidence satisfies the requirements of Maryland Rule 4-613 and if either the writing is a substantially verbatim version of the prior oral statement or the declarant has previously

adopted or ratified the writing as an accurate summary of the prior oral statement. In this case, the defense satisfied the foundational requirements of the rule, but failed to establish that the police report was a substantially verbatim version of the prior allegedly inconsistent statement of Laura B. or that she had previously adopted it. The Circuit Court properly excluded that report from evidence.

2.      It was permissible for the prosecutor to ask the SAFE nurse who examined Laura B. shortly after the alleged rape whether the account given to the nurse by Laura B. during the examination was "consistent or inconsistent with" the physical injuries observed by the nurse. The nurse's response that the injuries she observed on Laura B. "would verify" Laura B.'s account was, in context, most likely understood as an affirmation that the injuries were consistent with what Laura B. told the nurse and the trial court was not required to strike the statement. Even if the nurse's use of the word "verify" could be considered an inadmissible comment concerning the general credibility of Laura B., the court's failure to strike the nurse's answer was, at worst, harmless error.

3.      Because it is not readily apparent that the factual basis for the jury's guilty verdict on the false imprisonment count was separate from that of the guilty verdict on the first degree rape count and because all of the elements of false imprisonment are also elements of a first degree rape, the conviction for false imprisonment should be merged into the conviction for first degree rape for sentencing purposes.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT EVENLY BETWEEN PETITIONER AND HARFORD COUNTY.**

53

IN THE COURT OF APPEALS

OF MARYLAND

No. 46

September Term, 2013

WARDELL MONROE BROOKS

v.

STATE OF MARYLAND

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Concurring Opinion by Adkins, J.

Filed:     August 27, 2014

I agree with the Majority opinion, except with respect to its finding no error in the trial court's failure to strike Nurse Harden's response to the prosecutor's question, indicating she could verify the victim's accounting of the events that transpired.

I agree with Judge Harrell's dissenting opinion when he concludes that refusing to strike this testimony was error by the trial court. I disagree, though, with Judge's Harrell's conclusion that this error was prejudicial. In my opinion, there was sufficient corroborating evidence to render this error harmless. Such evidence includes the police officer's testimony about his arrival at the victim's house, Nurse Harden's non-objectionable testimony about the significant physical injury to the victim, and the photographs of the victim taken at the time of the crime. I agree with Judge McDonald's analysis when he concludes that if there were error, it was harmless.

Accordingly, I join in the judgment of the Majority, and some of its rationale, but not its failure to strike Nurse Harden's response as described above.

IN THE COURT OF APPEALS

OF MARYLAND

No. 46

September Term, 2013

_____

WARDELL MONROE BROOKS

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

_____

Dissenting Opinion by Harrell, J.,
which Greene, J., joins.

_____

Filed: August 27, 2014

Technically, I dissent, although I agree with much of the Court's opinion. The only point upon which I part company with the Majority is with regard to admitting Nurse Harden's testimonial response (to the prosecutor's legitimate question) that her findings from her physical examinations of Laura B. "would verify" what Laura B. told her. Contrary to the analysis and conclusion of the Majority opinion that allowing the response to be considered by the jury was not error and, if error, was harmless (Maj. slip op. at 41-44), I would find error and a quite harmful one, to boot. Accordingly, I would reverse the judgment of the Circuit Court and remand the case for a new trial.

As the Majority opinion concedes, "the word 'verify' . . . might well suggest that [Nurse Harden] had assessed Laura B.'s statement to her to be the one true version of events." Maj. slip op. at 41. Yet, the Majority opinion engages thereafter in a rationalization, based on linguistic gymnastics, that it could have meant something else in the greater context here. Although such an analysis may beguile some jurists and lawyers, one should not lose sight of who the fact finder was at Brooks's trial – a jury of his peers. I do not accept that they, unpracticed most likely in the ways of legal legerdemain, would perceive what Nurse Harden said in such a caged manner as the Majority opinion imagines, nor am I willing to assume, at Brooks's expense, that was the case here.

As the Majority opinion must concede, "verify" usually means "to establish the truth." That is the sense most often associated with that word by lay people and lexicographers. *See, e.g., Merriam Webster's Collegiate Dictionary* 1312 (10th ed. 1993) ("verify" – "to establish the truth, accuracy, or reality of"). This is what, for present purposes, we must assume the jury understood. It was prejudicial error for the jury to have

been permitted to consider Nurse Harden's answer. Her reply was more than simply saying that Laura B.'s version was not excluded as an explanation of her injuries. The use of the term "verify" suggested that it was the one "true" version. This was analogous to the social worker's testimony in *Bohnert v. State*, 312 Md. 266, 539 A.2d 657 (1988), based on a child's statements that the victim's behavior showed that she was in fact a victim of sexual assault. Both statements amount to telling the jury that the alleged victim was telling the truth and, by strong implication, the defendant was not. *See Bohnert*, 312 Md. at 275-76, 539 A.2d at 661-62.

Just as this Court in *Bohnert* held that the trial court's error in admitting the social worker's impermissible reflection on the victim's testimony warranted a new trial, the trial court's error in admitting Nurse Harden's testimony was not a harmless error and warrants a new trial in this case. The standard of review for harmless error is:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, *beyond a reasonable doubt, that the error in no way influenced the verdict*, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict.

*Dorsey v. State,* 276 Md. 638, 659 (1976) (emphasis added).

We have been reluctant to hold that an error was harmless when the error could have affected the jury's assessment of the credibility of either the defendant or the victim, and when the outcome of the trial hinged on whether the jury believed the defendant's or the victim's version of events. *See, e.g., Clemmons v. State*, 352 Md. 49, 720 A.2d 1170 (1998)

(finding that the trial court's error in admitting evidence that a co-defendant had pled guilty to the same crime was not harmless and stating that the outcome of the case "depended largely on credibility – which of two versions the jury was going to believe); *Beales v. State*, 329 Md. 263, 619 A.2d 105 (1993) (holding that the trial court's error in admitting evidence of the defendant's prior theft conviction was not harmless and noting that the relative validity of the prosecution and defense's different accounts of the incident "depended largely on the credibility of the witnesses").

Although there was other evidence to corroborate Laura B.'s testimony (e.g., the observations of the law enforcement officers at Laura B.'s house when they arrested Brooks, Nurse Harden's testimony as to the injuries she observed on Laura B., and the photographs of Laura B. taken on the night of the alleged rape), the evidence of physical injuries was not itself conclusive as to whether a rape occurred, as evidenced by Nurse Harden's admission, on cross-examination, that "women can be injured during [unforced] sex." Because the outcome of the case depended largely on whether the jury believed Laura B.'s or Brooks's version of events, I am not prepared to declare that the trial court's admission of Nurse Harden's testimony — that her findings would "verify the story" that Laura B. told her—was harmless beyond a reasonable doubt.

Judge Greene authorizes me to state that he joins the views expressed here.